Diane M. SNIDER, Guardian of the Person and Estate of Donnie Ray Snider, II, Plaintiff-Appellant

v.

BOB HEINLIN CONCRETE CON-STRUCTION COMPANY, Defendant-Appellee.

No. 82A01-8605-CV-00132.

Court of Appeals of Indiana, First District.

April 16, 1987.

Rehearing Denied May 29, 1987.

Charles C. Griffith, Leslie C. Shively, Johnson, Carroll & Griffith, Evansville, for plaintiff-appellant.

Fred S. White, Bamberger, Foreman, Oswald and Hahn, Evansville, for defendant-appellee.

NEAL, Judge.

STATEMENT OF THE CASE

Plaintiff-appellant, Diane M. Snider (Snider), Guardian of the Person and Estate of Donnie Ray Snider, II, appeals the decision of the Vanderburgh Superior Court, which granted summary judgment in favor of the defendant-appellee, Bob Heinlin Concrete Construction Company (Heinlin), denying Snider's allegations of negligence.

We affirm.

STATEMENT OF THE FACTS

In 1980–81, Sam Biggerstaff, an engineer, was employed by Paul and Robert Hatfield to draw plans for the Regency Club Apartment Complex, including the

swimming pool. The plans were submitted to and approved by the Administrative Building Council, and other required public bodies. The plans contained an option between the use of concrete and fiberglass walls in constructing the pool. The pool, as designed by Biggerstaff, was 50 feet long by 20 feet wide, with water depth of three feet at the shallow end and five feet, two and one-half inches at the deeper end. The walls formed a right angle to the bottom. By an oral contract (there was an unsigned written one), Heinlin, through Bob Heinlin, was employed to build it. Though following basic designs of Biggerstaff, the Hatfields, acting as contractor and manager, specifically authorized the pool to be built from a package or kit purchased from Swimcraft, which provided for fiberglass walls, instead of concrete. Heinlin was not required by the contract to provide a flow meter, automatic chemical treatment units, a deck around the pool, depth markers, pool rules, or diving or warning signs.

The finished pool and the Biggerstaff plans, as specifically amended and authorized by the Hatfields, and built by Heinlin, can be described as follows. It was 50 feet long and 20 feet wide. At the shallow end it had steps for entry into the pool. The water depth, commencing at a point six inches below the deck, was three feet at the shallow end. From the shallow end out 14 feet to a floating rope divider, which accompanied the kit to divide the shallow from the deeper end, the depth remained at three feet. From there the bottom sloped off to mid-point reaching a depth of five feet two and one-half inches. Around the edge of the pool three or four feet down, a safety ledge of four inches or more protruded out from the side upon which weak swimmers could rest. This too was a part of the kit. The fiberglass walls were 42 inches high. Below the bottom of the fiberglass walls the bottom of the pool is concrete and shaped in a curve to join the bottom of the fiberglass walls. The bottom of the pool from the side wall slopes gradually out three feet, where the bottom becomes flat and remains flat until it reaches a point three feet from the next side wall.

The pool needed a pump and filters with sufficient capacity to refilter the water every eight hours, or three times a day. Because Swimcraft did not have one of that capacity, one was purchased from B–Mark, which exceeded Biggerstaff's specification. It was the largest one B–Mark had. There was no flow meter or automatic chemical treatment system, but the pool was to be chemically treated manually. A chemical test kit came with the pool kit, but Hatfield had his own chemical test kit purchased from Firemaster. The pump and equipment were located and installed by Heinlin in a room provided by the Hatfields. The filter had a pressure gauge on it which had been installed at the factory, and Heinlin merely connected the unit. The pool had skimmers around it, which are small rectangular windows in the side of the pool four inches to six inches below the deck at the water line. The skimmers' purpose is to filter the water by use of a suction device which pulls surface water to it and takes off leaves and any other matter that is floating on the pool. A plastic drain cover is located in the deepest part of the pool and is twelve inches square. The pool had no diving board and was not to be utilized for diving. From Swimcraft, Heinlin got fiberglass wall panels, skimmers, return inlets, underwater lights, walk-in steps, hand rails and ladders; but the pump and filter came from B–Mark. Concrete and pipes were procured locally.

Heinlin's contract was to install the kit, and its job was finished after it was in place. Another contractor built the deck, and Heinlin had no instructions from the Hatfields to provide pool depth markings, warning signs, safety rails, or "no-diving" signs; Bob Heinlin assumed that these were the owner's responsibility. Heinlin had nothing to do with the chemicals. Bob Heinlin gave no instructions as to the operation of the pool, except telling Hatfield employees how to operate the pump and filter, and to backwash the system. The Hatfields concede that the pool was built according to their instructions, and that Robert Hatfield had specifically authorized all the changes from the Biggerstaff plans.

It is not shown that the Biggerstaff plans ever included rules, depth markings, or warning signs prohibiting diving. No such signs were put up at the pool by the Hatfields. There were no contour lines at the bottom of the pool, nor was there a full-time life guard. No records or logs of pool operation were kept. Complaints that the water in the pool was dirty were received in 1982 and July 1983 by the health authorities, and the problems were remedied.

On August 2, 1983, Donnie Ray Snider, II, age 21, a former high school athlete, who had swum and dived since age seven, and who had attended college for over a year, visited his girlfriend, Tammi, at her apartment at Regency. Such visitations, starting in June or July of 1983, had been regular, and Tammi and he had utilized the pool frequently. On those occasions, the last time being four or five days before August 2, 1983, he had swum and dived in the Regency pool and knew its depth and configuration. Donnie was five-foot six inches tall and weighed 145 pounds. On that date, Tammi and he went swimming at 12:30 or 1:00 p.m., and entered the pool by the steps. Before entering the pool, he could see that the water was murky, the first time he had seen it that way that summer. Ordinarily, he could see the bottom, but this time he could not. Because the pool was dirty, they quickly got out and sat on the deck. Some child had lost his snorkel, so Donnie, Tammi, and others searched the pool for it. Donnie waded all about the pool feeling the bottom with his feet, and after five minutes, he found the snorkel and retrieved it with his foot. During the search, he could feel the slope as he waded around, the water coming only to his chin in the deepest part. The floating rope was not in place. Tammi and he got out and resumed their positions on the deck. As they got ready to leave, Donnie decided to go into the pool and cool off. At a point in the deep end, near the ladder, he took two quick steps and, by his own testimony, did a "swan dive"—a dive executed by extending his arms out from the side of his shoulders intending to bring them to-gether in front of his head just before entering the water. However, he did not get his arms in front of his head in time, and he went into the water head first. He hit something, by reason of which he sustained a severe spinal injury. It was not established whether Donnie hit the bottom, sides, or safety ledge.[1]

Dr. Eric William Mood, Ph.D., Snider's expert witness, was deposed and stated that the pool was deficient in a number of ways:

(a) There were no automatic chemical feed units, which provide a disinfectant on a steady regulated basis, without which there occurs a growth of bacteria which, as significant here, makes the water murky. Record of its operation must be kept so that its effect can be monitored.

(b) There was no flow meter, which would provide information that the water was circulating once every eight hours. A drop in the reading would indicate that the filter was clogged.

(c) There was a pressure gauge, which indicates the filter is clogged and a back-washing is required, that was located on the filter in such a way that it was difficult to read (one had to stoop over to read it). Such created an inference that it was not properly monitored.

(d) There was a lack of records by pool management as to chemical use, in order to monitor the whole pool program as required by the State Board of Health.

(e) There was no adequate chemical test kit.

(f) There was a non-standard and hazardous shape to the pool bottom and the safety ledge, which was more than four inches wide, and could not be seen in murky water.

(g) There were no warning signs, no "no-diving" signs, no depth markings, no pool rules posted; and there was a defective ladder and a missing drain cover.

---

1. It was conceded by Snider in oral argument that Donnie did not strike the safety ledge or the shallow end. She speculates that he struck either the bottom or the drain.

## ISSUES

Although the parties to this appeal differ in the expression of the issues involved, the central issue is whether there is an absence of a genuine issue of material fact as to the liability of Heinlin, an independent contractor, for the injuries sustained by Donnie Ray Snider, a third party, entitling Heinlin to summary judgment as a matter of law. Because of our resolution of this case, we need not address the other issues presented.

## DISCUSSION AND DECISION

In reviewing a motion for summary judgment on appeal, we must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. *Flynn v. Klineman* (1980), Ind.App., 403 N.E.2d 1117. We will affirm the trial court's judgment if it can be sustainable on any theory found in the record, *Havert v. Caldwell* (1983), Ind., 452 N.E.2d 154, especially when the parties have addressed themselves to the merits of the issues propounded. *See id.* If, after considering the pleadings, depositions, answers to interrogatories, admissions, and affidavits there is no genuine issue as to material facts necessary for resolution of the issues involved, the moving party is entitled to a judgment as a matter of law. Ind.Rules of Procedure, Trial Rule 56(C).

■ Snider argues that Heinlin, the independent contractor, remained liable for a number of reasons. She argues that the pool was not built as designed by Biggerstaff, and addresses the deficiencies in (f) above, as well as the other changes in the pool. Those arguments are meritless because there is no showing whatever that those matters entered into the causation of Donnie's injuries at all. As important here, the pool shape, size, and depth of the water were not changed. There is no showing that he hit a plastic drain, safety ledge, or the changed configuration of the bottom near the wall. The only possible inference in the evidence is that he hit the bottom.

Snider also argues that the lack of depth markings, lack of signs prohibiting diving, lack of contour lines, and lack of posted pool rules, as noted in (g) above, continue to impose liability on the independent contractor. It is clear and uncontroverted that while such defects can affect the owner's or manager's liability, Heinlin did not contract to install such safety devices. It is questionable as to how much good such warnings would have been to a person who knew exactly how the pool was made and how deep it was.

Snider's third set of arguments address the inadequate filter and chemical system described in (a) through (e) above, which caused the water to be murky. When the water is murky, a person diving into the pool could not see the bottom and correspondingly control his angle of descent. He could then inadvertently strike the bottom with his head even if he knew the depth. Such act is the only legitimate inference that we can see to support liability on the contractor.[2] Snider does not, in her brief, show what Biggerstaff's plans called for as related to filter and chemical systems, but she argues that a well-operated pool would include those matters in (a) through (e). While this may be so, is it the responsibility of the contractor who built and equipped it as directed, or the owner? Heinlin's contract was limited to the kit. Heinlin did not even build the deck, which was built by another contractor after it finished. The main thrust of the problem is murky water, a result of bad maintenance and operation.

The legal basis of Snider's claim for liability against Heinlin involves the alleged negligence of an independent contractor causing injury to a third party. Essentially, Snider claims that, as a result of Heinlin's omissions, and inadequate equipment, the pool water became so cloudy Donnie could not see the bottom of the pool and was injured when he struck the bottom of the pool. There are two general rules which could insulate Heinlin, a contractor, from liability to Snider, a third party. The supreme court in *Citizens Gas & Coke*

---

**2.** Snider conceded in oral argument that this is her principal contention of liability.

*Utility v. American Economy Insurance Co.* (1985), Ind., 486 N.E.2d 998, reaffirmed the rule established in *Daugherty v. Herzog* (1886), 145 Ind. 255, 44 N.E. 457, which held that an independent contractor is not liable for injuries to third parties after acceptance of the work by the contractor. Both parties here also acknowledge that where an independent contractor performs a contract according to plans and specifications approved by the contractor, it is not liable for resulting injuries. *Great Atlantic & Pacific Tea Co. v. Wilson* (1980), Ind.App., 408 N.E.2d 144, *trans. denied; see Davis v. Henderlong Lumber Co.* (N.D. Ind.1963), 221 F.Supp. 129.

The rules enunciated in these cases are tempered by exceptions which, based on humanitarian principles, impose a legal duty on independent contractors to third persons independent of a contract. *See Citizens Gas, supra.* In other words, privity of contract is abolished where personal injury is concerned. *Id.*

■ An independent contractor remains liable to third persons, even after work has been completed and accepted, where personal injury is caused by work which was left "in a condition that was dangerously defective, inherently dangerous or imminently dangerous such that it created a risk of imminent personal injury." *Citizens Gas, supra* at 1000; *see Wilson, supra; Holland Furnace Co. v. Nauracaj* (1938), 105 Ind.App. 574, 14 N.E.2d 339.

■ Where the plans and specifications are so obviously defective that no reasonable independent contractor would follow them, the independent contractor would not escape liability by relying on them. *Davis, supra; Wilson, supra.*

In citing these general rules and the exceptions to them, the court in *Holland Furnace, supra* at 579–81, 14 N.E.2d 342, elaborated on their applicability and relation to both sales of products or personalty and construction of structures:

" 'Where an independent contractor is employed to construct or install any given work or instrumentality, and has done the same and it has been accepted by the employer and the contractor discharged, he is no longer liable to third persons for injuries received as a result of defective construction or installation'

\* \* \* \* \* \*

It is broadly true that where the charge of negligence is based upon a breach of duty arising out of contractual relations, no cause of action arises in favor of one not in privity to such contract. As well settled and as authoritative as the general rule itself are certain exceptions. Such exceptions arise where one has, by sale or otherwise, put into circulation, so to speak, some noxious or imminently dangerous thing which is likely to cause serious injury to any person into whose hands it may come, including poisons not labeled, explosives, vicious animals, etc. These exceptions apply, not only to sales of personalty, but to the construction of structures imminently dangerous to human life, while such structure is within the possession and control of the wrongdoer. If the thing sold or constructed be not imminently dangerous to human life, but may become such by reason of some concealed defect, then a liability may arise against such vendor or constructor if he knew of the defect and fraudulently concealed it.... There is, however, another recognized exception, viz.: A contractor continues liable where the work is turned over by him in a manner so negligently defective as to be imminently dangerous to third persons." (Citations omitted.)

Further, as stated in 21 I.L.E. *Negligence* sec. 54 (1959):

"The rules of law concerning the liability of manufacturers or sellers of products or articles which are not imminently dangerous to human life, but which may become such by reason of some concealed defect of which they have knowledge and fraudulently conceal it, or of imminently dangerous products or articles, ... apply not only to manufacturers or sellers of personalty but also to contractors installing or constructing something on realty." (Footnote omitted.)

It is clear from these cited rules that proof of mere negligence in constructing something on realty is insufficient to impose liability on an independent contractor for injuries incurred by a third party after acceptance by the owner. The negligence must create some situation which is noxious, inherently or imminently dangerous, and likely to cause injury, or it must involve a known or fraudulently concealed defect.

In elaborating on the definition of inherent or imminent danger, BLACKS LAW DICTIONARY 884-5, 921 (rev. 4th ed.1968) provides:

> "INHERENTLY DANGEROUS. Danger inhering in instrumentality or condition itself at all times, so as to require special precautions to prevent injury, not danger arising from mere casual or collateral negligence of others with respect thereto under particular circumstances."
>
> "IMMINENT. Near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous."
>
> "IMMINENTLY DANGEROUS ARTICLE. One that is reasonably certain to place life or limb in peril." (Citations omitted.)

Even assuming that Heinlin was negligent in selecting or installing the equipment, there is nothing inherently or imminently dangerous about the equipment itself or the lack thereof. If it is further assumed that the absence of certain equipment alone can cause the water to become cloudy, there is no indication that the water can acquire this condition other than over a gradual period of time. In other words, it is not shown that improper or inadequate equipment alone creates an inherently or imminently dangerous situation, the natural or probable consequences of which, or the inevitable result of which would cause injury to third persons.

We also note that rules and regulations concerning swimming pool equipment are promulgated primarily for purposes such as sanitation, healthfullness, and cleanliness. 660 IAC 5-2-5 (1984) (now 675 IAC 9-1-3) lists several requirements for pool structure and safety equipment standards, but pumps and filtration are absent from these safety provisions. The requirements for recirculation system standards, filter standards, and disinfectant and chemical feeder standards are contained in 660 IAC 5-2-8, -9, and -10, and such equipment used here must be National Sanitation Foundation listed, or listed by another approved listing agency.

Furthermore, the evidence in the case at bar suggests that the pump and filter equipment installed by Heinlin did work. The pool was completed in 1981, and the accident occurred in August 1983. It is undisputed that the Hatfields had monitored the accuracy of the pool equipment since one of them called Heinlin to repair defective equipment which had malfunctioned, and Heinlin had the equipment repaired. It is also undisputed that two nuisance complaints had been filed with the Board of Public Health about the condition of the pool. The Hatfields thereafter saw to it that the pool was cleaned, and the Board allowed them to continue the operation of the pool. This evidence shows the pool equipment was in working order or capable of it, and was acceptable to the Board. The cause of the occasional problems with murky water is primarily attributable to the maintenance and testing of the water condition by the Hatfields. At best, both were at fault, but the acts or omissions of Heinlin did not create an inherent or imminent danger. Any danger which may have presented itself was within the sole control of the Hatfields, the manager of the pool. We have noted that one who lacks possession and control of property, such as Heinlin, should not be held liable for injuries he is no longer in a position to prevent. *Zimmerman v. Moore* (1982), Ind.App., 441 N.E.2d 690.

The exception which holds an independent contractor liable for following obviously defective plans is not demonstrated here, for Snider did not enter the engineer's plans and specifications into the record, nor did she show what they called for in regard to equipment. Bob Heinlin

recalled that the engineer's plans specified the equipment and the capacity thereof; however, he believed the equipment specified was outdated and twice the cost, so he discussed the use of alternative equipment with Robert Hatfield. Heinlin claimed the alternative equipment he was authorized by Robert Hatfield to use met or exceeded the capacity of the equipment specified by the engineer. Aside from these facts, Heinlin's use of a swimming pool kit and other commercially available swimming pool equipment cannot be said to be so obviously defective that no reasonable contractor would use them. Snider merely claims that better equipment could have been used, but makes no showing that no reasonable contractor would use the equipment used by Heinlin.

For the foregoing reasons, this cause is affirmed.

Judgment affirmed.

ROBERTSON, J., concurs.

RATLIFF, C.J., concurs in result.