**NATIONAL STEEL ERECTION, Appellant (Defendant),**

v.

**Kelly E. HINKLE, Appellee (Plaintiff).**

No. 63A04–8711–CV–338.

Court of Appeals of Indiana, Fourth District.

July 17, 1989.

Peter G. Tamulonis, John B. Drummy, Kightlinger & Gray, Indianapolis, Ron A. Hobgood, Brent R. Weil, Kightlinger & Gray, Evansville, for appellant.

Bruce A. Smith, Washington, for appellee.

MILLER, Judge.

National Steel Erection [National] appeals a jury verdict in favor of Kelly E. Hinkle [Hinkle] who was injured when a roof constructed by National collapsed under his weight and he fell 20 to 25 feet to the floor below. We have consolidated and rephrased the issues as follows:

1. Whether the judgment was contrary to law and not supported by the evidence.[1]

2. Whether the trial court erred in denying National's motion for summary judgment.

3. Whether the trial court erred in giving two of Hinkle's tendered instructions and refusing three of National's tendered instructions.

Although we find National was not entitled to summary judgment and the evidence was sufficient to support the verdict, we reverse with instructions to grant National a new trial because Hinkle's instruction No. 1, given by the trial court, misstated the law with regard to the contractor's liability.[2]

## FACTS

Hinkle was employed as a maintenance worker by Alumax, Inc., which operated an aluminum recycling plant near Bicknell, Indiana. The recycling process used by Alumax creates an environment that is corrosive to metal.

In January or February 1984, Alumax had to replace the roof over a dross storage shed because the old fiberglass roof had been destroyed by fire. Alumax asked National to submit an estimate for replacing the roof. Beginning in 1980, National had been employed by Alumax for various construction jobs, and was aware of the corrosive environment in the plant. It submitted an estimate for replacing the roof with Resolite, a fire-retardant fiberglass material which is resistant to corrosion.[3] Steve Richardson, Alumax's plant manager, rejected the bid because he felt the Resolite was too expensive, instead he asked National to rebid the job on a labor only basis with Alumax providing the roofing material. Richardson instructed the Alumax purchasing agent, Teresa Yokum, to buy the cheapest material she could. In accordance with Richardson's instructions, Yokum purchased 28 gauge galvanized metal, which National used to replace the roof.

The roof of the dross storage shed was relatively flat and consisted of a number of large beams laid north to south approximately twenty feet apart, and eighteen purlins[4] laid east to west approximately five feet apart. The sheets of galvanized metal were laid north to south over the purlins

---

1. National also asserts the trial court erred in denying its motion for judgment on the evidence. Because of our resolution of issue 1, we need not discuss this issue.

2. National also asserts it should be granted a new trial because the trial court denied its request for a continuance when Hinkle allegedly asserted a new theory of liability (strict liability) on the day of trial. Because we grant the relief requested, we need not discuss this issue.

3. The roof that burned was nonfire-retardant fiberglass.

4. Purlin is defined as "a horizontal member in a roof supported on the principals and supporting the common rafters". *WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY* (1976).

and attached to the purlins with sheet metal screws. The sides of the sheets were affixed to each other with stitch screws. Each sheet of metal was twelve feet long. Because the purlins were five feet apart, there was a two foot overlap at every other purlin. The normal overlap on a roof of this kind is one foot. After installing some of the sheets, National suggested cutting the sheets to create the normal overlap but was instructed not to do so by Alumax.

The dross storage shed contained a number of tanks used to store dross, potash and salt. One of the tanks, located in the northeast corner of the shed penetrated the roof. Alumax intended to replace this tank and instructed National to leave the roof open in that area.

National completed work on the roof in January or February 1984. In July 1984, after the tank was replaced, Alumax decided to roof the area over it. Although Alumax had never done its own roofing work, it was decided because the plant was in "financial crisis", that Alumax would use its own employees to do the work rather than employing National or another roofing contractor. John White, Alumax's maintenance supervisor, instructed Hinkle, David Overton and Mitch Arthur to roof the area over the tank. They used the same material and method as used by National. In order to do the work, they had to stand on the roof installed by National. They worked by standing on the purlins. When it was necessary to move from one purlin to another, Hinkle walked on the roof, while Overton jumped from one purlin to the next. Hinkle and Overton did not use pickboards (pieces of wood laid from one purlin to the next to redistribute the weight on the roof), as was customary in the roofing industry. However, both Hinkle and Overton testified they were unaware of this custom.

After the roof was completed, leaks developed over the tank. On August 2, 1984 Hinkle and Overton were instructed to tar the seams in the area of the leaks. They worked on the roof on August 2 and continued working on August 3. In the afternoon, Hinkle walked across the area of the roof installed by National. The roof gave way close to one of the purlins where the metal sheets overlapped and Hinkle fell 20 to 25 feet to the floor below, suffering serious injury.

After the accident, White examined the underside of the roof and found it was seriously deteriorated. The metal was badly corroded in the areas where the sheets overlapped. The corrosion was more evident on the underside of the roof, but there were pin holes and small rust spots on the top.

Hinkle's expert, John Burcham, testified the metal used was too thin for a flat roof with a five foot span between the purlins, and would be dangerous to workers installing the roof. He also testified the excessive overlap aggravated the deterioration problem.

## DECISION

Although we reverse and remand on the basis of improper instructions, we must also consider National's contention the verdict was contrary to law and not supported by sufficient evidence and that the trial court erred in denying its motion for summary judgment.

### Sufficiency of Evidence

National argues there was insufficient evidence to prove the roof was inherently or imminently dangerous. In addition, it asserts—because it followed the plans and specifications of Alumax—it could not be held liable for defects which resulted from such plans and specifications.

When a verdict is challenged as being contrary to law, this court does not reweigh the evidence or judge the credibility of witnesses. We will consider only the evidence most favorable to the judgment and the reasonable inferences to be drawn therefrom, and will reverse only where the uncontradicted evidence leads to a conclusion opposite to that reached by the trial court. *Indiana & Michigan Electric Co. v. Terre Haute Industries, Inc.* (1987), Ind. App., 507 N.E.2d 588.

■ Here, where we are dealing with the liability of an independent contractor, we observe that generally, an independent contractor is not liable for injuries to third persons resulting from defects in construction after the work has been accepted by the owner. *Citizens Gas & Coke Utility v. American Economy Insurance Co.* (1985), Ind., 486 N.E.2d 998. However, exceptions to this rule exist when the structure was left "in a condition that was dangerously defective, inherently dangerous or imminently dangerous such that it created a risk of imminent personal injury." *Id.* at 1000; *See Snider v. Bob Heinlin Concrete Construction Co.* (1987), Ind.App., 506 N.E.2d 77; *Holland Furnace Co. v. Nauracaj* (1938), 105 Ind.App. 574, 14 N.E.2d 339. In addition, "[i]f the thing sold or constructed be not imminently dangerous to human life, but may become such by reason of some concealed defect, then a liability may arise against such vendor or constructor if he knew of the defect and fraudulently concealed it." *Holland Furnace, supra* at 581, 14 N.E.2d at 342.

Inherently dangerous is defined as: "Danger inhering in instrumentality or condition itself at all times, so as to require special precautions to prevent injury; not danger arising from mere casual or collateral negligence of others with respect thereto under particular circumstances." *BLACK'S LAW DICTIONARY,* p. 921 (4th Ed.Rev.1968). *See Neal v. Home Builders, Inc.* (1953), 232 Ind. 160, 111 N.E.2d 280. National argues installing or repairing a roof is not inherently dangerous.[5] This argument incorrectly shifts the focus of this case from the condition of the roof to the activity of repairing the roof. The question here is whether the instrumentality (the roof itself) was inherently dangerous not whether the activity (installing or repairing a roof) was inherently dangerous. Nevertheless, National's argument is well taken. A roof, even a thin metal one, is not in itself dangerous at all times. The term "inherently dangerous" is more properly applied to activities or instrumentalities which are, by their nature, always dangerous, i.e. blasting or wild animals. *See Johns v. New York Blower Co.* (1982), Ind. App., 442 N.E.2d 382.

■ However, National fails to adequately consider the further language of the exception, which permits a contractor to be held liable if the condition was "imminently dangerous." Indiana courts have not specifically distinguished the two terms, and our research has not revealed an Indiana case expanding on the definition of "imminently dangerous."[6] *BLACK'S LAW DICTIONARY, supra,* p. 885 defines an imminently dangerous article as: "One that is reasonably certain to place life or limb in peril." Courts in other jurisdictions have defined an imminently dangerous instrumentality as: "of such a nature that danger in its use is imminent, that is, its use for the purpose for which it is intended is fraught with immediate peril, carries a threat of serious impending danger," *Jump v. Ensign–Bickford Co.* (1933), 117 Conn. 110, 118, 167 A. 90, 92 and "[a]n article ... though it may safely be used for the purpose intended if properly constructed, yet by reason of defective construction a threatened injury may be reasonably apprehended from its use." *Rulane Gas Co. v. Montgomery Ward Co.* (1949), 231 N.C. 270, 56 S.E.2d 689, 693. When determining whether a structure is imminently danger-

---

5. National cites a line of cases involving an owner/contractor's liability for injury to an independent contractor's employee while performing the contracted work. *Johns v. New York Blower Co.* (1982), Ind.App., 442 N.E.2d 382 (contractor's employee injured in 30 foot fall from beam on which he was working); *Perry v. Northern Indiana Public Service Co.* (1982), Ind.App., 433 N.E.2d 44 (subcontractor's employee injured in 20 foot fall from fan housing he was welding); *Cummings v. Hoosier Marine Properties, Inc.* (1977), 173 Ind.App. 372, 363 N.E.2d 1266 (contractor's employees killed when sewer trench in which they were working collapsed). These cases are inapplicable because they focus on the *activity* not the *instrumentality.*

6. We note that courts in other jurisdictions also tend to confuse the terms, by sometimes broadening the definition of "inherently dangerous" to include "imminently dangerous" or by discussing the terms as a unit. *See* Annot. 13 A.L.R.2d 191 (1950); Annot. 58 A.L.R.2d 865 (1958).

ous, the inquiry must focus on whether the structure if defectively constructed, creates a risk of impending, serious danger. In *Holland Furnace, supra,* our supreme court implicitly accepted this definition. In *Holland,* the contractor installed a furnace pursuant to a contract with the tenant of a building. The evidence showed the furnace was installed too close to unprotected woodwork which caught fire and partially destroyed the plaintiff's building.[7] The court held there was sufficient evidence to prove the condition was imminently dangerous. The furnace, if properly installed, could have been safely used for its intended purpose, but because of its defective installation, it created a risk of imminent peril.

■ In this case, the roof, if properly constructed, could have been safely used for its intended purpose. However, if defectively constructed, it created a risk of impending injury to anyone who might be required to walk on it. It was reasonably foreseeable that repairs would have to be made to the roof from time to time, requiring workers to walk on it. This is especially so when National knew that the roof was not complete and workers would be required to walk on it while completing the installation. There was evidence—that the excessive overlap caused the roof to deteriorate more quickly and that the metal sheets used for the roof were too thin and subject to rapid corrosion—from which the jury could have found that the roof was imminently dangerous.[8]

National also argues that the roof was not imminently dangerous because it be-

came dangerous only after the corrosive environment had affected it for a period of six months. We disagree. "To be imminently dangerous it is not necessary for the article or instrumentality to cause danger immediately upon its first use. The nature of the article or instrumentality is the primary consideration in determining whether it is imminently dangerous." *Kuhr Brothers Inc. v. Spahos* (1954), 89 Ga.App. 885, 81 S.E.2d 491, 494, (overruled on other grounds, *Whiten v. Orr Construction Co.* (1964), 109 Ga.App. 267, 136 S.E.2d 136). Here, there was evidence the nature of the roof was to deteriorate rapidly in the corrosive environment and the deterioration was exacerbated by the excessive overlap at the purlins.

■ National also claims the verdict was contrary to law and not supported by sufficient evidence because it followed the plans and specifications of the owner, Alumax. A contractor is not liable for injuries to third parties resulting from defects in the plans or specifications of the owner unless they are so obviously dangerous that no reasonable contractor would follow them. *Davis v. Henderlong Lumber Co.* (N.D. Ind.1963), 221 F.Supp. 129; *Great Atlantic & Pacific Tea Co. v. Wilson* (1980), Ind. App., 408 N.E.2d 144, *trans. denied; Hobson v. Beck Welding and Manufacturing, Inc.* (1969), 144 Ind.App. 199, 245 N.E.2d 344.

■ It was undisputed that National used the roofing material supplied by Alumax and followed its directions to not cut the sheets to avoid the excessive overlap.

7. The plaintiff was the owner of the building and was not a party to the contract.

8. National also cites *Hinkle v. Niehaus Lumber Company* (1988), Ind., 525 N.E.2d 1243, in support of this argument. This case was originally part of the case before us. Hinkle sued National and Niehaus Lumber, the supplier of the metal sheets used for the roof. Niehaus Lumber filed a motion for summary judgment which was granted by the trial court. The court of appeals reversed in *Hinkle v. Niehaus Lumber Company* (1987), Ind.App., 510 N.E.2d 198. Our supreme court granted transfer, reversed the court of appeals and affirmed the trial court's entry of summary judgment. *Hinkle,* 525 N.E.2d 1243. The supreme court concluded:

"We find no evidence in the record that the roofing sheets were unreasonably dangerous when used in 'reasonably expectable handling and consumption.'" *Id.* at 1246. The supreme court based its conclusion, at least in part, on evidence in the record that Niehaus Lumber had no knowledge the sheets were to be used in a corrosive environment. The conclusion that a component of the roof (the metal sheets) was not unreasonably dangerous when used in reasonably expectable handling or consumption (a non-corrosive environment) does not compel a conclusion that the roof as installed—in a corrosive environment and with excessive overlap—was not imminently dangerous.

However, there was conflicting evidence as to whether a reasonable contractor would have followed these specifications. Hinkle's expert, John Burcham, testified the metal sheets were too thin to be safely used on a flat roof with a five·foot span. In addition, there was testimony the excessive overlap caused the roof to deteriorate more rapidly in the area of the overlap. Here, the facts were in dispute and do not lead only to a conclusion opposite to that reached by the trial court.

In addition, we note the rationale for relieving the contractor of liability when it follows the plans and specifications of the owner is based, at least in part, on the view that the owner has greater knowledge concerning the construction. In *Davis v. Henderlong Lumber Co., supra,* the contractor constructed a chemical fume hood and exhaust fan for a laboratory according to specifications of the laboratory's research director and plans drawn by an architect. The contractor had no experience in construction of chemical laboratories. The plaintiff was injured by poisonous fumes which were not adequately removed by the exhaust fan. The court quoted with approval *Ryan v. Feeney & Sheehan Bldg. Co.* (1924), 239 N.Y. 43, 145 N.E. 321: "How was an ordinary contractor or builder to know this? The matter was for the engineer and architects to determine and design. The builder's experience might have suggested another construction would have been better but it was not its judgment on these matters which was to be taken, and it was justified in relying upon the experience and skill of the architect and supervising engineer." *Davis, supra* at 133–34. (Emphasis deleted).

In *Davis* and *Ryan,* the contractor relied on the plans and specifications of experts. Here, there were no formal plans or specifications, nor was there any evidence Alumax's plant manager was an expert in roofing or had any knowledge the roof might be unsafe. The only concern expressed by Alumax's employees was that the roof would not last as long as one made of fiberglass. National was equally aware of the corrosive environment and had far more knowledge regarding roof installa-

tion. Under these circumstances, we cannot say, as a matter of law, National was justified in relying on Alumax's specifications.

Finally, National argues Hinkle was contributorily negligent by failing to use pickboards when working on the roof. Once again, the evidence was in conflict. There was testimony that it was industry custom to use pickboards when working on a roof. There was also testimony, neither Hinkle nor Overton were aware of this custom. Both Hinkle and Overton testified the roof did not appear to be deteriorated from the top. National is asking us to reweigh the evidence, which we cannot do.

*Summary Judgment*

National asserts the trial court erred in denying its motion for summary judgment. In reviewing a denial of a motion for summary judgment we stand in the shoes of the trial court. We liberally construe the evidence in favor of the non-movant and resolve any doubts as to the existence of a genuine factual issue against the proponent of the motion. *Willsey v. Peoples Federal Savings & Loan Assn.* (1988), Ind. App., 529 N.E.2d 1199. The trial court must consider the pleadings, depositions, admissions and affidavits before it to determine if any genuine issue of material fact exists. *Nicoll v. Community State Bank* (1988), Ind.App., 529 N.E.2d 386. Even if the facts are not in dispute, if conflicting inferences may be drawn from the facts, summary judgment is inappropriate. *Board of Aviation Commissioners of St. Joseph County v. Hestor* (1985), Ind.App., 473 N.E.2d 151.

When the motion for summary judgment was filed, the trial court had before it the depositions of Hinkle, John White and Mike Horn, president of National. In his deposition, Horn testified the metal roofing material was thin, but would have held the weight of an average man when the roof was installed. He also testified he believed the additional overlap at the purlins would add strength to the roof. In contradiction, White testified the additional overlap caused the roof to deteriorate more rapidly.

295

Horn's testimony was itself contradictory concerning National's knowledge of the corrosive environment and of the necessity for workers to walk on the roof to complete the installation. Not only were the facts in dispute, but the inferences to be drawn from the facts were in conflict. The trial court did not err in denying the motion for summary judgment.

## INSTRUCTIONS

National asserts it is entitled to a new trial because the trial court improperly gave two of Hinkle's tendered instructions as modified and refused three of its tendered instructions.

The trial court gave Hinkle's tendered instruction No. 1, as modified, which read:

National Steel Erection had a duty to examine the plans for the installation of the roof over the dross area to determine if these plans were sufficient and also to discover any defects in those plans or instructions that were reasonably discoverable or patent. If you find by a preponderance of the evidence National Steel Erection knew or should have known that the plans or instructions for the installation of the roof over the dross area were defective, and that National Steel Erection followed these plans or instructions without pointing out such defects to Alumax, such conduct would constitute negligence on the part of National Steel Erection, unless Alumax knew or should have known of such defects.

National objected to the instruction on the basis that it misstated the law and was not supported by sufficient evidence. We agree that the instruction misstates the law.

 Hinkle claims the instruction is supported by the decisions in *Capitol Builders, Inc. v. Shipley* (1982), Ind.App., 439 N.E.2d 217 and *Luxurious Swimming Pools, Inc. v. Tepe* (1978), 177 Ind.App. 384, 379 N.E.2d 992, (overruled in part on other grounds, *Berns Construction Co. v. Miller*

(1987), Ind., 516 N.E.2d 1053). Both *Capitol Builders* and *Luxurious Swimming Pools* concerned a contractor's duty to warn the *owner/contractor* of defects in the plans and specifications. The contractor's duty to a *third party*, such as Hinkle, was not in issue. The contractor's duty to third parties is not so extensive. A contractor is not liable to third parties for defects in the plans and specifications unless the defects create a condition which is inherently or imminently dangerous. *Citizens Gas, supra.* In addition, the plans and specifications must be so defective that no reasonable contractor would have followed them. *Davis, supra; Hobson, supra.* National correctly notes this instruction would permit the jury to find it liable for mere negligence in failing to inform the owner of a defect even if the defect did not create a condition which was inherently or imminently dangerous. This is not the law. As the court noted in *Snider, supra:* "It is clear from the cited rules that proof of mere negligence in constructing something on realty is insufficient to impose liability on an independent contractor for injuries incurred by a third party after acceptance by the owner." *Id.* at 82.

National also claims the trial court erred in giving Hinkle's tendered instruction no. 2, as modified, which read: [9]

If you find by a preponderance of the evidence that the activity of installing the roof by National Steel Erection was inherently or imminently dangerous, or if the acts of National Steel Erection resulted in an imminently dangerous situation the natural or probable consequences of which would be injury to other persons coming in contact with the roof, *then National Steel Erection would be liable for the injuries or damages to Kelly Hinkle even if National Steel Erection performed the installation according to Alumax's specifications and even if the work done by National Steel Erection was accepted as satisfactory by Alumax.* (Emphasis added)

9. Although we reverse on the basis of the incorrect statement of the law in Hinkle's Instruction no. 1, we will discuss the other challenged instructions as a guide to the trial court on retrial.

National objected to the instruction on the following basis.

> [I]t misstates any present law in Indiana, is contrary to the law, is not supported by sufficient evidence, is confusing and misleads the jury and is prejudicial to the Defendant on the grounds first that, that it is contrary to Indiana law in that it states that the, the Defendant National Steel Erection by the acts of National Steel Erection, the acts resulted in imminently dangerous situation. That is irrelevant under Indiana law...both under the definition of inherently dangerous and also in the cases of...Davis and... as we previously cited to, and *Hobson v. Beck Welding and Manufacturing, Inc.,* 144 Ind.App. 199 [245 N.E.2d 344], on the grounds that in the situation of the law of Indiana, you must look to the type of activity being performed and not to the specific acts performed by a person doing an activity, which may or may not have made it inherently dangerous. Uh, the real question, as I've stated, is the question of whether the activity in general was inherently dangerous and not a specific factual inquiry as to whether the incident in question is inherently dangerous. Along those same lines, the instruction is contrary to the evidence as the accepted definition under Indiana law of *Neal,* and *Progeny* state that the inherently dangerous activity must, inherently dangerous condition or activity must be dangerous at all times and that again, you look at the nature of the activity not to the specific facts of the situation. And as such it is contrary to the evidence in this case because the evidence is that the roof was not inherently dangerous for a certain period of time prior to the accident and that by common knowledge, as a matter of law, roofing, roofing activities are not inherently dangerous. And lastly, in regard to that instruction, it of course, misleads the jury because it improperly emphasizes and states that we're looking to the acts of National Steel Erection to determine whether this instrumentality is inherently dangerous. And as such it misleads, confuses the

jury, and is very prejudicial to the Defendant and amounts to ...an argument by the Court to the jury emphasizing one particular factor in this case, and of course that, as I've stated before, is contrary to law.

This objection is far from clear. We agree with National that it incorrectly focuses on the *activity* of installing the roof, rather than on the *condition* of the roof. However as we discussed, there was sufficient evidence from which the jury could have concluded the condition of the roof was imminently dangerous.

■ Although National did not object to the emphasized language, we note that it appears to conflict with National's Instruction No. 4 which read:

> A contractor who furnishes labor to perform work according to plans, directions, instructions, specifications, or certifications of another may rely thereon and is not chargeable with any inadequacy or insufficiency of such plans, directions, instructions, specifications, or certifications, nor his employees, except where such plans, directions, instructions, specifications or certifications are so defective that a reasonable person would not rely upon them.

Instruction No. 4 was a correct statement of the law. *Davis, supra.* Although Instruction No. 4 may be read as an amplification of the emphasized language in Instruction No. 2, the two instructions, when read together, are potentially confusing.

National also claims the trial court erred in refusing its tendered instructions nos. 2, 3 and 8.

■ In reviewing the refusal of tendered instructions, we consider: (1) whether the tendered instruction was a correct statement of the law; (2) whether it was supported by the evidence; and (3) whether the substance of the instruction was adequately covered by other instructions. *Beird v. Figg and Muller Engineers, Inc.* (1987), Ind.App., 516 N.E.2d 1114.

■ National's tendered instruction No. 2 read:

One who engages another to perform work or furnish labor in connection with the work in which the former is skilled and over which he retains supervision, engineering and inspection, is bound to furnish the contractor, or the employees of the contractor, with adequate plans and directions, and which the contractor's employees may rely; and the person who furnishes such engineering, supervision, and inspection and retains and exercises control thereover is responsible for the results of such supervision, engineering, direction, control, and inspection and for any lack thereof.

This instruction was a correct statement of the law, as far as it went, *Davis, supra,* and was supported by the evidence. However, the trial court also refused Hinkle's tendered instruction on concurrent negligence. Without such an instruction, the jury could have believed that if Alumax was negligent, National could not be liable. In addition, the substance of this instruction was covered by National's Instruction No. 4.

National claims the trial court erred in refusing its Instruction No. 3 which read:

If the overall supervision of the work and the engineering of the work was provided by Alumax, and the Defendant, National Steel Erection, undertook to furnish labor to install the subject roof under the supervision of Alumax, the Defendant National Steel Erection is not responsible for failures or defects occurring or appearing afterwards as a result of the wearing effects of the elements, or for the consequences of uses not contemplated at the time of construction. Contractors are not expected to be insurers of the everlastingness of their work, or that the materials and workmanship they use will be wearproof against the elements.

This instruction was not supported by the evidence. *BLACK'S LAW DICTIONARY, supra,* p. 612 defines "elements"

as "The forces of nature ...Popularly, fire, air, earth and water, anciently supposed to be the four simple bodies of which the world was composed.... It has also been said that 'damages by the elements' means the same thing as 'damages by the act of God.'" (Citations omitted). There was no evidence the roof was damaged by natural elements, nor was there any evidence the injury resulted from consequences of uses not contemplated at the time of construction. It is not error to refuse an instruction not supported by the evidence. *Beird, supra.*

Finally, National argues the trial court erred in refusing its tendered instruction no. 8 which read:

If you find from a preponderance of the evidence that the Defendant, National Steel Erection, constructed the sheet metal roof involved in this lawsuit for Alumax, Inc., and under Alumax, Inc.'s supervision, and according to the plans, directions, and specifications furnished by Alumax, Inc., and if you further find that Alumax, Inc. had an opportunity to examine and inspect the roof after it was completed and then accepted the completed roof in the condition in which it was, the acceptance of the roof by Alumax, Inc., operated as the intervention of an independent human agency which broke the chain of causation so as to preclude the Plaintiff from asserting or relying upon any duty on the part of the Defendant to use care for the Plaintiff in the construction of the roof in question, unless you further find that the work done by the Defendant was so obviously defective as to be imminently dangerous to third persons.

This instruction was generally a correct statement of the law.[10] Hinkle argues the substance of this instruction was adequately covered by his Instruction No. 2. We agree Instruction No. 2 covered the substance of this instruction, however, the re-

10. We question the use of the word "obviously" in the portion of the instruction reading: "unless you further find that the work done by the Defendant was so *obviously* defective as to be imminently dangerous to third persons." We

find no support for the proposition that the defect must be obvious. The question is: obvious to whom? A contractor may be liable for hidden defects, if he knew of the defect and concealed it. *Holland Furnace, supra.*

fused instruction was better than the one given because it correctly states the general rule first, then gives the exception. Therefore, it was less likely to confuse the jury.

In conclusion, although there was sufficient evidence to support the verdict if the jury had been properly instructed, the incorrect statement of the law in Hinkle's instruction no. 1, requires us to reverse, and remand with instructions to grant National a new trial.

CONOVER, P.J., and SHIELDS, J., concur.