**MERIDIAN MUTUAL INSURANCE COMPANY, Appellant– Plaintiff,**

v.

**Jon B. PURKEY d/b/a Purkey's Heating & Cooling, Joe Collins, Debbie Collins, Michael J. Lorren d/b/a Lorren & Company, Phillip Hendricks, Brenda Hendricks, and United Farm Family Mutual Insurance Company, Appellees–Defendants.**

No. 29A02–0106–CV–348.

Court of Appeals of Indiana.

June 14, 2002.

Stephen J. Peters, Stewart & Irwin, P.C., Indianapolis, IN, Attorney for Appellant.

James J. Hutton, Hannon Centers Roop & Hutton, P.C. Indianapolis, IN, Attorney for Amicus Curiae Metropolitan Property and Casualty Insurance Company.

James T. Ferrini, Barbara I. Michaelides, Clausen Miller P.C., Chicago, IL, Richard L. Norris, Norris, Choplin & Schroeder, LLP, Indianapolis, IN, Attorney for Appellee Michael J. Lorren d/b/a Lorren & Company.

John M. Mead, Leeuw & Doyle, P.C., Indianapolis, IN, Attorney for Appellees Phillip Hendricks, Brenda Hendricks, and United Farm Family Mutual Insurance Company.

## OPINION

BROOK, Chief Judge.

### Case Summary[1]

Appellant-plaintiff Meridian Mutual Insurance Company ("Meridian") appeals the trial court's entry of summary judgment in favor of appellees-defendants Jon B. Purkey d/b/a Purkey's Heating & Cooling ("Purkey"),[2] Joe Collins and Debbie Collins ("the Collinses"), Michael J. Lorren d/b/a Lorren & Company ("Lorren"), Phillip Hendricks and Brenda Hendricks ("the Hendrickses"), and United Farm Family Mutual Insurance Company ("United") (collectively, "Appellees"). We reverse.

### Issue

Meridian raises a single issue for review, which we restate as whether the trial court erred in granting summary judgment in favor of Appellees.

### Facts and Procedural History

The relevant facts most favorable to Meridian as the party opposing summary judgment indicate that Purkey operated Purkey's Heating & Cooling as a sole proprietorship and was insured by Meridian under a commercial general liability policy ("the Policy"). The Policy excluded coverage for bodily injury or property damage "arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned or operated by or rented or loaned to any insured." Appellant's App. at 27, 27A. In 1996, Purkey purchased a 1988 Ford Bronco ("the Bronco") for both business and personal use.

On or a few days before April 2, 1997, having smelled gasoline and seen "drips of gas" under the vehicle, Purkey determined that the Bronco had developed a gas leak. *Id.* at 161A. Purkey "didn't know what was wrong with [the gas tank]"; once he "got the gas out [he] wanted to drop the tank and find out where it was actually leaking from." *Id.* at 167A. Once Purkey "found out what the problem was that's when [he could decide] whether . . . [he] could fix it [him]self or [whether he needed] to buy a new one or [whether he needed] to take it someplace." *Id.* If the repair was minor, Purkey intended to fix the gas tank himself. *See id.* The gas leak did not "render the Bronco inoperable in any way," but Purkey wanted to fix the leak to "return the vehicle to an efficient operating machine." *Id.* at 168. Purkey planned to continue driving the licensed and plated Bronco after fixing the leak.

---

**1.** We heard oral argument in this cause on February 26, 2002, at the Indiana University School of Law Indianapolis. We thank the faculty, staff, and students of the law school for their interest and hospitality, and we commend counsel for their superb oral and written advocacy.

**2.** Purkey is not a party to this appeal.

On April 2, 1997, Purkey backed the Bronco into a garage he rented from Lorren in an apartment building at 200 West Jackson Street in Cicero, Indiana. Purkey began siphoning gas from the tank on the left-hand side of the Bronco into an open container. As "the act of the siphoning effect was taking place," *id.* at 173,[3] Purkey was leaning on the Bronco's tailgate looking forward through the windshield at the "[b]eautiful day" when he and his clothes caught fire. *Id.* at 162, 165. Purkey extinguished the flames on his clothes, *id.* at 169, but not before suffering second degree burns to his hands and fingers and first degree burns to his face and lower lip. Lorren's App. at 4. Purkey ran into the adjacent office to tell his secretary "that there was an explosion over there," Appellant's App. at 164, then drove the Bronco out of the garage. The fire in Purkey's garage melted the Bronco's taillights and spare tire cover and destroyed Lorren's apartment building at 200 West Jackson Street, where the Collinses resided. The fire spread to and destroyed other buildings, including 160 West Jackson Street, where the Hendrickses resided.

On December 12, 1997, the Collinses sued Purkey for negligence, alleging that the pilot light of Purkey's gas furnace had ignited the gas fumes in his garage. On December 11, 1998, Lorren sued Purkey for negligence, waste, and breach of contract, claiming that Purkey had caused or allowed a fire to occur.[4] On March 29, 1999, as the Hendrickses' subrogee, United

sued Purkey for negligence, claiming that "the fumes of the siphoned gasoline ignited and set the entire building ablaze." Appellant's App. at 66.

On December 22, 1998, Meridian filed a complaint against Appellees for declaratory judgment, requesting that the trial court determine that it owed no obligation to Purkey under the Policy *vis-à-vis* the fire and that the Policy did not cover the remaining Appellees' claims. On April 21, 1999, Meridian filed an amended complaint in which it alleged that "[a]s a direct result of Purkey's maintenance and repairs upon the gasoline tank upon his Ford Bronco, an explosion and fire was caused which destroyed the apartment building at 200 West Jackson in Cicero, Indiana." *Id.* at 11. On June 15, 2000, Lorren filed a motion for summary judgment as to Meridian's amended complaint. On August 30, 2000, Meridian filed a cross-motion for summary judgment against Appellees and a memorandum in opposition to Lorren's summary judgment motion. On October 16, 2000, Lorren filed a memorandum in opposition to Meridian's cross-motion for summary judgment, and United filed an opposing memorandum two weeks later. On November 27, 2000, Meridian filed a consolidated reply to all pending summary judgment motions.

On May 2, 2001, the trial court issued two rulings that it later clarified upon Meridian's motion. In its July 16, 2001, order

---

**3.** In his deposition, Purkey stated several times that he did not know or did not recall whether the siphoning was complete when the fire started. *See, e.g.,* Appellant's App. at 162 ("Q. Do you recall if you were in the course of siphoning when this fire occurred? A. I don't know, ma'am."); *id.* at 165 ("Q. Okay. Do you recall anything about where you were in the siphoning process? A. I know, I mean I know the gas had to be I mean I was siphoning out the gas from the fuel tank to the holding facility. Whether it

was stopped or not, I don't know."). At one point, however, Purkey stated unequivocally that the siphoning was still in progress when the fire started. *See id.* at 173 ("A. But *I am sure* that the act of the siphoning effect was taking place [when the fire started], I mean.") (emphasis added).

**4.** Lorren later amended his complaint to include an allegation of res ipsa loquitur.

on Meridian's motion to clarify, the trial court stated that it had intended to "fully and finally dispose of any issues in this cause" by denying Meridian's summary judgment motion and by entering final summary judgment in favor of Appellees and against Meridian. *Id.* at 273. Meridian now appeals.

## Discussion and Decision

### *Standard of Review*

When reviewing an entry of summary judgment, we apply the same standard as the trial court. *Burkett v. Am. Family Ins. Group*, 737 N.E.2d 447, 451 (Ind.Ct. App.2000).

> Summary judgment is appropriate when the evidentiary matter designated to the trial court shows both that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. We will affirm a summary judgment on appeal if it is sustainable under any theory or basis found in the evidentiary matter designated to the trial court. Additionally, when material facts are not in dispute, our review is limited to determining whether the trial court correctly applied the law to the undisputed facts. When there are no disputed facts with regard to a motion for summary judgment and the question presented is a pure question of law, we review the matter *de novo*. Consequently, because the interpretation of a contract is a matter of law, cases involving the interpretation of insurance contracts are particularly appropriate for summary judgment.

*Id.* at 451–52 (citations and internal quotation marks omitted).

In considering the pleadings and evidence sanctioned by Indiana Trial Rule 56(C), we may not decide their weight or credibility. *See Shelter Mut. Ins. Co. v. Barron*, 615 N.E.2d 503, 505 (Ind.Ct.App.

1993), *trans. denied*. "All evidence must be construed in favor of the opposing party, and all doubts as to the existence of a material issue must be resolved against the moving party." *Id.* "The fact that the parties make cross-motions for summary judgment does not alter our standard of review. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Indiana Farmers Mut. Ins. Group v. Blaskie*, 727 N.E.2d 13, 15 (Ind.Ct.App.2000). "The trial court's grant of summary judgment is clothed with a presumption of validity and the appellant bears the burden of proving that the trial court erred." *Bamberger & Feibleman v. Indianapolis Power & Light Co.*, 665 N.E.2d 933, 936 (Ind.Ct.App. 1996).

In *Erie Insurance Co. v. Adams*, 674 N.E.2d 1039 (Ind.Ct.App.1997), *trans. denied*, we noted that

> [t]he interpretation of an insurance contract is a question of law for the court. And, language in an insurance contract which is clear and unambiguous should be given its plain and ordinary meaning. Indiana courts have repeatedly noted that insurers are free to limit liability "in any manner not inconsistent with public policy, and an unambiguous exclusionary clause is ordinarily entitled to construction and enforcement." However, exceptions, limitations and exclusions must be plainly expressed in the policy. The exclusionary clause must clearly and unmistakably bring within its scope the particular act or omission that will bring the exclusion into play, and any doubts as to the coverage shall be construed against the contract drafter.

*Id.* at 1041 (citations omitted); *see also Cent. Indiana Carpenters Welfare Fund v. Ellis*, 412 N.E.2d 865, 870 (Ind.Ct.App. 1980) (stating that where an insurer seeks

to avoid liability under an exclusion, "the insurer is generally said to have the burden of proving facts establishing the applicability of the limiting provision").

When construing an insurance policy, we may not extend insurance coverage beyond that provided in the contract, nor may we rewrite the clear and unambiguous language of the insurance contract. This court strives to ascertain and enforce the intent manifested in the policy.... The fact that the parties disagree as to the interpretation of the contract does not establish an ambiguity; the contract is ambiguous only if it is susceptible to more than one interpretation and reasonable persons would honestly differ as to its meaning.

*Sell v. United Farm Bureau Family Life Ins. Co.*, 647 N.E.2d 1129, 1131–32 (Ind.Ct. App.1995) (citations omitted), *trans. denied.*

### The Policy's Exclusion

■ As previously mentioned, the Policy excludes coverage for " '[b]odily injury' or 'property damage' arising out of the ownership, maintenance, use [5] or entrustment to others of any aircraft, 'auto' or watercraft owned by operated by or rented or loaned to any insured.' " Appellant's App. at 27, 27A. The parties' dispute focuses on whether the property damage at issue arose out of the maintenance [6] of Purkey's

Bronco. We first determine whether Purkey's siphoning of the Bronco's gas tank constituted maintenance.

### "Maintenance"

In the leading Indiana case on this issue, *Miller v. Loman*, 518 N.E.2d 486 (Ind.Ct. App.1987), the muffler of the truck in which Miller was a passenger fell onto the roadway. Intending to remove the muffler from the roadway until the truck's owner could retrieve it, Miller exited the truck and was kicking the muffler toward the side of the road when he was struck by Loman, an uninsured motorist. Miller claimed that he was entitled to coverage under the truck driver's liability policy because he was involved in the maintenance of the truck when the accident occurred. The *Loman* court responded,

We ... assume [Miller] considers kicking the muffler an act of maintenance, since he was attempting to preserve the muffler so that [the truck driver] could reinstall it on the truck.

. . . .

[W]e note Miller was not involved in maintenance of the car when he was injured. *In order to be involved in maintenance of a vehicle, one must be working on it in some manner.* The authorities construing provisions providing coverage for injuries arising out of maintenance of a vehicle are virtually

---

**5.** Because Meridian offers no substantive argument that the property damage arose out of the use of the Bronco, we do not address this question on appeal.

**6.** In his answer to Meridian's amended complaint, Purkey admitted that he was "performing maintenance and repairs on the gasoline tank of [the] Bronco in his garage" on the day of the fire. *See* Appellant's App. at 11 (Meridian's amended complaint, ¶ 7); *id.* at 70 (Purkey's answer, ¶ 7). Meridian contends that Purkey's admission "forecloses the other Appellees, even though they are potential judg-

ment creditors, from arguing otherwise." Appellant's Br. at 18. Without addressing Lorren's argument that Meridian has waived this contention by failing to cite supporting authority, we simply note that "[a]s a general rule admissions by one party to an action are not admissible as evidence against a co-party." *Indiana State Highway Comm'n v. Vanderbur*, 432 N.E.2d 418, 422 (Ind.Ct.App. 1982). We also note that Purkey stated that he "lack[ed] sufficient information to admit or deny the cause of the explosion or fire[.]" Appellant's App. at 70.

unanimous in holding the injury must be due to the maintenance. Any connection between Miller's injuries and eventual maintenance of the truck is simply too farfetched to bring him within the policy.

*Id.* at 492–93 (emphasis added) (citations omitted).

More specifically, "to maintain" has been defined as "to preserve or keep in an existing state or condition and embraces acts of repair and other acts to prevent a decline, lapse, or cessation from that state or condition." 7 AM.JUR. 2d *Automobile Insurance* § 150 (1997); *see also Krempl v. Unigard Sec. Ins. Co.*, 69 Wash.App. 703, 850 P.2d 533, 536 (1993) ("This court has defined maintenance as the labor of keeping something in a state of repair or efficiency."). By siphoning the gasoline from the tank of the still-functioning Bronco to facilitate the repair of the leak, Purkey was keeping the Bronco "in a state of repair or efficiency" and was therefore maintaining it for purposes of the Policy's exclusion.

Appellees' suggestion that the siphoning was merely "preliminary" or "diagnostic" ignores the fact that many acts of maintenance involve a series of steps, some of which may be categorized as "preliminary" and/or "diagnostic." [7] The first step in repairing the leak, and therefore the first step in maintaining the Bronco, was to siphon the gas out of the tank. We must now determine whether the property damage at issue arose out of the maintenance of the Bronco.

### *"Arising out of"*

■ In addressing this question, both parties rely on the seminal case of *Indiana Lumbermens Mutual Insurance Co. v. Statesman Insurance Co.*, 260 Ind. 32, 291 N.E.2d 897 (1973) (*"Lumbermens II "*), in which a deliveryman transported a water softener to a customer's home, unloaded the water softener from the delivery truck, and was injured when the customer's negligently maintained basement stairs collapsed beneath him. The deliveryman recovered from Lumbermens, the customer's insurer, which then initiated a subrogation action against Statesman, the insurer of the delivery truck. Statesman's auto liability policy provided coverage for injuries "arising out of the ownership, maintenance or use" of the truck.[8] *Id.* at 34, 291 N.E.2d at 899. In determining that Lumbermens could not recover under Statesman's policy,[9] our supreme court stated,

The accident did not arise out of the use of the truck. As the trial court pointed out, the proximate cause of the accident was the negligent maintenance of the staircase. . . .[10]

---

**7.** As Purkey himself stated, "Sir, I mean I started step one, and I am sure there was [sic] more steps to it." Appellant's App. at 170.

**8.** Statesman's policy provided that it would " 'pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of *bodily injury* * * * caused by accident *and arising out of* the ownership, maintenance or use of any automobile.' " *Indiana Lumbermens Mut. Ins. Co. v. Statesman Ins. Co.*, 274 N.E.2d 419, 426 (Ind.Ct.App.1971) (*"Lumbermens I "*), *vacated by Lumbermens II* (emphases added).

**9.** The *Lumbermens II* court duly noted that it was "not dealing with the two parties to the [insurance] contract" and therefore could "seek out the general intent of the contract from a neutral stance." *Lumbermens II*, 260 Ind. at 34, 291 N.E.2d at 899.

**10.** Specifically, the trial court found " '(t)hat the efficient and predominating cause of the *injury* to [the deliveryman] was the negligent act or omission of * * * [the homeowners] in the maintenance of their staircase.' " *Lumbermens I*, 274 N.E.2d at 426 (parentheses in original) (emphasis added).

We are of the opinion that what was intended by the words in the contract, 'arising out of the ownership, maintenance or use' of the truck as applied to unnamed insureds is synonymous to being caused by use of the truck (including the loading and unloading). Otherwise the insurance company becomes the insurer for every sort of accident by anyone to whom a delivery is made. We are in agreement with the trial court that the 'efficient and predominating cause' of the accident must arise out of the use of the vehicle in order for an unnamed insured to be covered.

*Id.* at 34, 291 N.E.2d at 898–99.

Understandably, in view of the *Lumbermens II* holding, the parties have framed their arguments in terms of whether the fire (i.e., the "accident") arose out of Purkey's maintenance of the Bronco. Given the language of the Policy exclusion in the instant case, however, the proper question before us is whether the *property damage* (i.e., the "injury") arose out of Purkey's maintenance of the Bronco.

Several panels of this court have applied, at least to some extent, a similar interpretation of the *Lumbermens II* test. In *Sharp v. Indiana Union Mutual Insurance Co.*, 526 N.E.2d 237 (Ind.Ct.App. 1988), *trans. denied* (1989), Leinenbach, the intoxicated insured, drove his vehicle across the center line and severely injured Sharp. The *Sharp* court relied on *Lumbermens II* in stating that Leinenbach's

policy exclusions unambiguously dictate that *bodily injuries* or *property damage* arising out of the use of a motor vehicle owned or operated by the insured, will not be covered under the homeowner's insurance policy. Therefore, if the efficient and predominant cause of Sharp's *injuries* arose from the use of Leinenbach's automobile, then Sharp's injuries

are not covered by Leinenbach's homeowner's insurance.

*Id.* at 239 (emphases added). The *Sharp* court rejected appellants' assertion that "Leinenbach's act of drinking alcohol to the point of intoxication was a separate and independent cause of Virgil Sharp's injuries." *Id.* at 240. Instead, the *Sharp* court concluded that "Leinenbach's consumption of alcohol prior to driving his automobile did not cause any *injury* which was independent of the use of his motor vehicle. It is only the act of driving an automobile while intoxicated that causes *injuries* or gives rise to an accident." *Id.* (emphases added). *Cf. Moons v. Keith*, 758 N.E.2d 960, 964 (Ind.Ct.App. 2001) (addressing auto policy coverage provision and concluding that plaintiffs' injuries did not arise out of the use of insured's car, in which they were shot by another motorist while stopped at an intersection; "[I]n order to find coverage, there must be a causal connection or relationship between the vehicle and the *injury*. ... Had a more specific tie between the vehicle and the *injuries* been shown, then the vehicle might have been more than the mere situs.") (emphases added), *trans. denied* (2002); *Franz v. State Farm Fire & Cas. Co.*, 754 N.E.2d 978, 981 (Ind.Ct.App.2001) (addressing comprehensive liability policy auto exclusion and concluding that coverage was excluded under the policy where teenager was injured in recreational "bus pull"; "But for the driver's failure to steer the bus or apply the brakes in time to avoid the accident, Taylor would not have suffered *injury*. In other words, the use of the bus was the 'efficient and predominating cause' of Taylor's *injuries*.") (emphasis added), *trans. denied* (2002); *Shelter Mut. Ins. Co.*, 615 N.E.2d at 506 (addressing auto liability policy exclusion where plaintiff was injured when she was pulled from the hood of insured's truck by her ankles;

"Consistent with the foregoing authority [including, *inter alia, Lumbermens II* ] we must conclude that the efficient and predominating cause of the *accident* in this case did not arise from the use of Barron's truck.... At most, the truck was little more than a platform that was only incidentally related to the accident. Because [plaintiff's] *injuries* did not arise out of the use of Barron's truck, the trial court properly denied Shelter Mutual's motion for summary judgment on this issue.") (citations omitted) (emphases added), *trans. denied; Barga v. Indiana Farmers Mut. Ins. Group, Inc.,* 687 N.E.2d 575, 579 (Ind.Ct.App.1997) (reversing order of summary judgment where it was unclear whether defendant was driving truck for personal use or in connection with his auto business operation for purposes of auto liability policy exclusion; "When such a combined usage exists, a question of material fact is presented concerning what was the predominant use of the vehicle at the time the accident occurred and, thus, the efficient and predominating cause of the *accident*.") (emphasis added), *trans. denied* (1998);[11] *Westfield Ins. Co. v. Herbert,* 110 F.3d 24, 26 (7th Cir.1997) (plaintiff injured when son of insured attempted to burn gasoline-soaked gasket off valve cover he had removed from an auto and intended to sell; applying Indiana law in holding that maintenance of the auto was not the " 'efficient and predominating' cause of the *accident* " and that homeowners policy auto exclusion therefore did not apply) (emphasis added).

In the instant case, Lorren contends that "[m]erely because the [Bronco] furnished a possible source of ignition is insufficient as a matter of law" to exclude coverage under the Policy. Lorren's Br. at 21. In support of this contention, Lorren cites *Almayor v. State Farm Fire & Casualty Co.,* 613 So.2d 526 (Fla.Dist.Ct. App.1993), and *Nationwide Mutual Fire Insurance Co. v. Allen,* 68 N.C.App. 184, 314 S.E.2d 552 (1984), *rev. denied.*

While working on an acquaintance's car, Almayor siphoned gas from the tank into a bucket, which he placed "next to the steps of the house." *Almayor,* 613 So.2d at 527. Ramirez, the insured, emerged from the house "with a freshly-lit cigarette in his hand. The cigarette ignited the gasoline fumes and caused a fire and explosion which severely burned Almayor." *Id.* The *Almayor* court reversed the trial court's determination that Ramirez's homeowners

> policy did not cover [his] potential liability because of the familiar "automobile exclusion[ ]" .... on the ground that the *accident* "arose out of" Ramirez's allegedly negligent use of flammable material, not the ownership, maintenance or use of the motor vehicle under repair. Indeed, the car had little, if anything, to do with the fire at all. It was merely the coincidental and legally remote source of a component, the gasoline, which was itself harmless until acted upon by the insured's negligence.

*Id.* (footnote omitted) (emphasis added).

In *Nationwide,* the insured decided to move his wife's

---

11. In a concurring opinion, Judge Sullivan noted that "under few, if any, sets of circumstances would an injury be truly 'caused by' an auto business operation. In such instances there is always some act of negligence which causes the injury as opposed to the abstraction of the business operation itself." *Barga,* 687 N.E.2d at 579–80. "Thus the test, more accurately stated in the case before us, is whether the efficient and predominating cause, i.e. the negligent driving of the vehicle, arose out of the auto business operation. In other words, if the efficient and predominating cause of the injury was directly and inextricably associated with the conduct of the business operation, it is within the exclusion and there is no coverage." *Id.* at 580.

Honda motorcycle into the living room of the apartment, intending to charge the battery, to check the timing, and to inspect the motorcycle to determine what repairs might be needed. Those repairs would be performed at a later date either by him, if possible, or by a repair shop, so that the Honda could be sold and used. He had no repair parts available and did not intend to repair it that day.

In preparation for a work place, Mr. Allen placed a plastic cover over the carpet in the living room and newspapers over the plastic. Then he brought in the motorcycle, placing it over the newspaper and plastic. Prior to taking the Honda into the apartment Mr. Allen had drained 1½ gallons of gas, but was unable to remove all of it from the main tank and was unable to remove any gas from the reserve tank. While inside the room he drained the oil from the motorcycle, placing it in a plastic milk carton upon the newspaper-covered plastic.

The battery was removed and activated to a trickle charger which was situated upon the newspaper-covered plastic. A portion of the gas tank was removed in order to examine the magneto. The motorcycle was supported by a kickstand, which was wet from exposure to the rain.

Mr. Allen placed a timing light, a bare light bulb in a socket, upon the fork of the front wheel and plugged the light into an outlet. He was not intending to fix or set the timing, but did intend to check to see by visual inspection if the timing was off.

*Nationwide Mut. Fire Ins. Co.*, 314 S.E.2d at 554. When Allen went to turn off the television, the motorcycle fell onto the coffee table and caught fire. In determining that the auto exclusion to Allen's homeowners liability policy did not apply, the *Nationwide* court stated,

It was Mr. Allen's handling of combustible materials (newspapers, plastic floor covering, gasoline, oil) in the immediate vicinity of ignition sources (an operating electrical battery trickle charger and an open light bulb as a timing light left upon a metal frame of the motorcycle) which created a risk covered by Nationwide–Fire's policy against personal liability and caused the fire. Mr. Allen obtained coverage to protect himself against this type of accident and to pay for property damage to others for which he might be liable.

We hold that the property damage which occurred did not arise out of either the ownership or the maintenance of the Honda motorcycle.

*Id.* at 555.

We do not find either *Almayor* or *Nationwide* to be persuasive here. In *Almayor*, as Meridian correctly observes, Ramirez was not involved in siphoning the vehicle's gasoline and indeed was not "even the owner or operator of the car." Appellant's Br. at 14. Unlike Ramirez, Purkey owned the vehicle at issue and was siphoning gasoline from the Bronco's tank when the fire started. Appellees note that Purkey stored flammable Freon and coil cleaner in the garage and that the ignition source might have been electrical panels, a furnace pilot light, or perhaps even a cigarette lit by Purkey, who had supposedly quit smoking one week before the fire.[12] They further observe that Purkey was simply gazing outside at the beautiful day

---

12. Purkey suffered burns to his hands and face and lower lip, and the hair around his face was singed. *See* Lorren's App. at 4. Although Purkey claimed that he did not recall whether he used his mouth to siphon the gasoline, *see* Appellant's App. at 161A, his injuries are certainly consistent with his having done so.

and that the siphoning process might have been complete when the fire started. The only reasonable inferences that can be drawn from the designated evidence, however, are that the fire originated at the rear of the Bronco, nowhere near the electrical panels or the furnace; that the fuel source was the gasoline vapors released during Purkey's maintenance of the Bronco, not the Freon or the coil cleaner; and that the maintenance, not Purkey's "handling of [an ignition source] in the immediate vicinity of [combustible materials,]" [13] was the efficient and predominating cause of the property damage.[14] Had Purkey not siphoned the Bronco's tank and thereby released the gasoline vapors, he could have admired the beautiful weather and struck dozens of matches without catastrophic result. The fact that Purkey was simply gazing outside and that the siphoning might have been complete when the fire started is of no consequence, given that the gasoline vapors were released during his maintenance of the Bronco. *Cf. Miller*, 518 N.E.2d at 492–93 ("Any connection between Miller's injuries and *eventual* maintenance of the truck is simply too farfetched to bring him within the policy.") (emphasis added).

We recognize that we must construe any doubts as to coverage against Meridian as the drafter of the Policy, but there is no doubt that the property damage arose out of Purkey's maintenance of the Bronco. We agree with Meridian that "court[s] must recognize the fact that there are different insurance policies on the market for different purposes." *Erie Ins. Group v. Alliance Envtl., Inc.*, 921 F.Supp. 537, 542 (S.D.Ind.1996) (discussing scope of professional services exclusion in general

business liability policy), *aff'd*, 102 F.3d 889 (7th Cir.1996). Purkey's commercial liability policy with Meridian excludes coverage for risks, such as the ownership, maintenance, or use of a vehicle, that are covered by other policies, such as those for auto liability. Even Purkey himself acknowledged the special risks inherent in vehicle maintenance:

> Q. Would it be correct to say it wasn't particularly safe for you to be siphoning gas inside this garage?
>
> A. That could be a correct statement.

Appellant's App. at 165. The Policy specifically excludes coverage for property damage arising from vehicle maintenance; therefore, Meridian is entitled to summary judgment against Appellees. We reverse the trial court's grant of summary judgment in favor of Appellees.

Reversed.

RILEY, J., and MATHIAS, J., concur.

---

**13.** *Cf. Nationwide Mut. Fire Ins. Co.,* 314 S.E.2d at 555.

**14.** Nor was Purkey's decision to store the gasoline in an open container the efficient and predominating cause of the property

damage, as United and the Hendrickses suggest. Had Purkey not maintained the Bronco by siphoning the gasoline into the container, there would have been no "build-up of fumes that subsequently ignited." United's Br. at 9.