J. Kelly FLYNN, Appellant (Plaintiff Below),

v.

James KLINEMAN, Jay Williams, Jr., and Dean Glasel, Appellees (Defendants Below).

No. 2–877A318.

Court of Appeals of Indiana, Fourth District.

May 7, 1980.

Stephen P. Zinkan, Zinkan, O'Hara & Campbell, Indianapolis, for appellant.

James E. Carlberg, Klineman, Rose & Wolf, Indianapolis, for appellees.

MILLER, Presiding Judge.

Plaintiff-appellant Flynn appeals the granting of the defendant-appellees' motion for summary judgment. Flynn, who purchased securities of the Sandy Creek Development Corporation, sued Klineman, Williams and Glasel for their failure to register the securities as required by Ind.Code 23–2–1–3.[1] His complaint demanded the pur-

---

1. IC 23–2–1–3 provides:
   "It is unlawful for any person to offer or sell any security in this state unless (1) it is registered under this act [23–2–1–1—23–2–1–25] or (2) the security or transaction is exempted under section 102 [23–2–1–2]."

chase price and attorney's fees pursuant to IC 1971, 23–2–1–19(a) (Burns Code Ed.) (amended 1975).[2] Defendants argued, *inter alia,* that IC 1971, 23–2–1–2(b)(10) (Burns Code Ed.) (amended 1975)[3] exempted the securities from registration as part of a "private offering". On cross motions for summary judgment, the trial court held for defendants, concluding the exemption did apply.

Flynn does not dispute that the elements of the exemption statute were met, with one exception: He argues he did not represent to the seller in writing as required by the statute that he purchased the securities for "investment" rather than for resale. The trial court found he did so represent, through writings including a signed election of Subchapter S tax status and corporate by-laws placing restrictions on resale of the

stock. We conclude the trial court erred when it found there was a written representation of investment intent within the meaning of IC 23–2–1–2(b)(10). We reverse and remand to the trial court.

The Sandy Creek Development Corporation was incorporated by Jay Williams on February 4, 1975, its purpose being to restore and refurbish an old railroad car, the "Sandy Creek", and ultimately lease it as an accommodation for meetings and parties. At the time Flynn purchased the securities, both Glasel and Williams were officers, directors and stockholders of the corporation while Klineman was an officer and stockholder. Sometime during the latter part of February, 1975, and the first part of March, 1975, Flynn met with Glasel, Klineman and Williams to discuss the "investment oppor-

There is no argument in this case that the securities, as opposed to the transaction, were exempted.

**2.** This statute was amended by Acts 1975, P.L. 261, § 15 pp. 1444–5, to incorporate minor changes not relevant to this opinion.

**3.** IC 23–2–1–2 provides:
"(b) The following transactions are exempted from section 201 [23–2–1–3] [security registration requirement]:

. . . .

(10) any offer or sale of a security if, during any period of twelve [12] consecutive months which includes the date of such offer or sale, the offeror or seller has not directed offers to sell securities of the same class to more than twenty [20] persons in this state, excluding in determining the number of such persons, persons receiving offers otherwise exempted by this section 102 and also excluding persons receiving offers of such securities made after registration thereof under this act, whether or not the offeror, seller, or any of the offerees or buyers are then present in this state and if (A) *each buyer in a sale exempted under this subsection represents in writing to the seller that he is purchasing such securities for investment,* and (B) no commission or other remuneration is paid or given for or on account of a sale exempted under this subsection (10); but the commissioner may by rule or order, as to any security or transaction or any type of security or transaction, [withdraw or] further condition this exemption, or increase or decrease the number of offerees permitted, or waive the

conditions in clauses (A) and (B) with or without the substitution of a limitation on remuneration; . . . [emphasis added]"
This statute was subsequently amended by Acts 1975, P.L. 261, § 2 pp. 1413–14 to allow an exemption under the following circumstances:
"(10) the offer of sale of any security by the issuer thereof if all of the following conditions are satisfied:
(i) there shall be not more than thirty-five (35) purchasers of the securities in any offering pursuant to this subsection, excluding in determining the number of purchasers, persons purchasing securities in a transaction exempted by any provision of section 2 [this section] of this chapter or persons purchasing securities after registration under this chapter;
(ii) the issuer does not offer or sell the securities by means of any form of general advertisement or general solicitation;
(iii) *each purchaser of the securities gives a written representation that he is acquiring the securities for his own investment*; and
(iv) if any commission or other remuneration is paid or given for soliciting any prospective buyer or selling any securities in any offering pursuant to this subsection, then each offeree shall be furnished with an offering statement which shall set forth all material facts with respect to such security, and the commissioner shall be notified in writing of the terms of the offer and if he does not disallow the exemption within the next five (5) full business days; . . . . [emphasis added]"
This amendment was not effective until after the transaction at issue on May 1, 1975.

tunity" offered by the Sandy Creek Development Corporation. As a result of the meeting, Flynn agreed to buy seven shares in the corporation for $5,250.00 and completed the purchase on March 28, 1975, by executing an initial subscription agreement. The stock of the Sandy Creek Development Corporation was never registered with the Indiana Securities Commissioner pursuant to IC 23–2–1–3, and on October 26, 1976, Flynn requested that Klineman, Glasel and Williams refund his original $5,250.00, plus interest and reasonable attorney's fees as provided in IC 23–2–1–19(a). When the defendants did not respond, Flynn filed suit for failure to register the securities. On February 7, 1977, the defendants filed a motion for summary judgment with supporting affidavits and exhibits, alleging that the Sandy Creek stock was exempt from registration by virtue of IC 23–2–1–2(b)(10), commonly known as the private offering exemption. Flynn filed two memorandums and an affidavit in opposition to defendants' motion for summary judgment and in the second memorandum filed an alternative cross-motion for summary judgment alleging that, as a matter of law, IC 23–2–1–2(b)(10), had not been complied with, in that an "investment letter" stating that Flynn was purchasing the stock for the sole purpose of investment, had not been obtained. As noted above, the trial court granted defendants' motion. Flynn argues on appeal that (1) the trial court improperly found that the offer and sale of securities was exempt from registration requirements under IC 23–2–1–2(b)(10); and (2) the defendants failed to meet their burden of proof in establishing that the securities were exempt from registration.

*ISSUE I*

We note that the primary purpose of a summary judgment under Ind. Rules of Procedure, Trial Rule 56 is to dispose of matters that do not require resolution by a jury or judge at trial, and that on appeal from a grant of summary judgment "[t]he only issues are whether the trial court correctly applied the law and whether there is a genuine issue of material fact." *Tekulve v. Turner*, (1979) Ind.App., 391 N.E.2d 673,

675. In this case, the appeal from the grant of defendants' motion involves only a question of law: whether the trial court properly determined that the Sandy Creek securities were exempt from registration by virtue of Flynn's alleged written representations that he was purchasing for investment.

We find the trial court granted summary judgment to defendants based on an erroneous construction of the private offering exemption expressed in IC 23–2–1–2(b)(10). The controlling language exempts:

"(10) any offer or sale of a security if, during any period of twelve [12] consecutive months which includes the date of such offer or sale, the offeror or seller has not directed offers to sell securities of the same class to more than twenty [20] persons in this state, excluding in determining the number of such persons, persons receiving offers otherwise exempted by this section 102 and also excluding persons receiving offers of such securities made after registration thereof under this act, whether or not the offeror, seller or any of the offerees or buyers are then present in this state and if (A) *each buyer in a sale exempted under this subsection represents in writing to the seller that he is purchasing such securities for investment,* and (B) no commission or other remuneration is paid or given for or on account of a sale exempted under this subsection (10); but the commissioner may by rule or order, as to any security or transaction or any type of security or transaction, [withdraw or] further condition this exemption, or increase or decrease the number of offerees permitted, or waive the conditions in clauses (A) and (B) with or without the substitution of a limitation on remuneration; . . . [emphasis added]"

Flynn's sole contention, as noted above, is that he did not represent in writing, as required by statute, to either the corporation or the defendants that he was purchasing the securities for "investment". The defendants countered this allegation by stating that Flynn, by signing his subscrip-

tion agreement, ascribed to corporate by-laws placing substantial restrictions upon resale of the securities, and that he also consented in writing to Subchapter S tax status for the Sandy Creek Development Corporation. They contend these are sufficient representations in writing within the meaning of the statute to show Flynn purchased the securities for "investment", and the stock is therefore exempt from registration under IC 23–2–1–2(b)(10).

█ It is a fundamental rule of statutory construction that a court may not interpret a statute which is clear and unambiguous on its face. *Economy Oil Corp. v. Indiana Department of State Revenue*, (1974) 162 Ind.App. 658, 321 N.E.2d 215, 218. Where a statute is susceptible to more than one interpretation, however, the court may consider the consequences of a particular construction. *Id.* The relevant statute in this case does not specify what constitutes a representation in writing that securities are being purchased for "investment"; thus, it is incumbent upon this court to decide that question. Because this is a case of first impression in Indiana, our analysis of relevant state law will consider parallel provisions at the federal level.

The most important federal statute for our purposes is the Securities Act of 1933.[4]

"The fundamental concept of the 1933 Act is the requirement that offerings of securities be registered with the Securities and Exchange Commission unless exempt under some provision of that Act. Registration requires the distribution of a prospectus containing an elaborate and detailed description of the issuer and the offering."

Boehm, *Federal Business Law and the Indiana Lawyer: The Impact of the Securities Law on the General Practitioner*, 48 Ind. L.J. 216, 219 (1973). The Securities Act proceeds upon a theory of disclosure; if the investor knows relevant facts concerning the securities, his decision to buy or not to buy will be an informed one. Despite the general policy of disclosure, however, Congress assumed that in certain circumstances there was no need for registration, or that the benefits of registration do not outweigh the difficulty and expense. There are four basic categories of transactions which the 1933 Securities Act exempts from its registration requirements: (1) transactions by persons other than issuers, dealers, or underwriters; (2) transactions not involving public offerings; (3) certain transactions by dealers; and (4) brokers' transactions. The provisions of IC 23–2–1–2(b)(10) parallel the federal exemption for number (2)—the so-called "private offering" exemption.

The Securities Act does not define "private offering", but the federal exemption has been interpreted to permit issuers to make isolated sales to particular persons who do not need the protection of the disclosure requirements because of their special knowledge. *SEC v. Ralston Purina Co.*, (1953) 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494. Whether an offering is public or private is a question of fact to be determined after considering circumstances such as the relationship between the offeror and the offeree and the size, scope, nature, and manner of the offering.[5]

Of course, the protections afforded under the federal exemption are meaningless if the initial, informed purchasers are merely conduits for sales to uninformed purchasers. *United States v. Custer Channel Wing Corp.*, (4th Cir. 1967) 376 F.2d 675, *cert. denied*, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119; *Gilligan, Will & Co. v. SEC*, (2d Cir. 1959), 267 F.2d 461, *cert. denied*, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152; and *Kaiser-Frazer Corp. v. Otis & Co.*, (2d Cir. 1952) 195 F.2d 838, *cert. denied*, 344 U.S. 856, 73 S.Ct. 89, 97 L.Ed. 664. Moreover, the goal of disclosure is defeated regardless of whether the initial purchaser intends to resell in violation of the Act, or whether the resale is innocent of fraudulent intent. Where purchasers buy with a view to resale, there is a greater likelihood the securi-

4. 15 U.S.C. § 77a *et seq.* (1976).

5. Securities Act Release No. 33–4552, Nov. 6, 1962, Fed.Sec.L.Rep. (CCH) ¶ 2770, 27 Fed.Reg. 11,316.

ties will pass from a small group of investors whose direct dealings with the corporation have provided them with special knowledge, to a larger number of uninformed investors. Thus, in applying the "public offering" exemption it is important to determine whether the *initial* purchaser acquires the securities for his own investment or, to the contrary, with resale in mind.

The federal act has been construed to require the securities issuer to investigate the investment intent of purchasers, and even prior to SEC Rule 146,[6] which requires a "signed written agreement" that the securities will not be improperly resold, it was customary for issuers to obtain letters from purchasers stating that the purchaser was buying the securities for investment purposes and not for resale. 69 Am.Jur.2d *Securities Regulation—Federal* § 106 (1973). Courts applying the federal exemption have not, however, regarded such letters as conclusive evidence of intent. *See, e. g., United States v. Custer Channel Wing Corp., supra,* and *Gilligan, Will & Co. v. SEC, supra. See also* 69 Am.Jur.2d *Securities Regulation—Federal* § 106 (1973).

The Indiana Legislature, when enacting the (b)(10) private offering exemption, saw fit not to include various subjective factors associated with the federal exemption. *See generally,* Doxsee, *Securities Problems in Indiana,* 17 Res Gestae 6, 9 (September, 1973 publication of the Indiana State Bar Association). In contrast to the broad language of the federal act exempting transactions "not involving any public offering",[7] the Indiana exemption relies on *objective* factors such as limiting the number of offers to twenty persons. Similarly, the Indiana provision, unlike either the federal act or the Uniform Securities Act,[8] expressly requires a written representation that the buyer is purchasing for investment rather than resale. The Indiana provision thus places more emphasis on the buyer's express

representations, perhaps to avoid the uncertainty involved in weighing more subjective factors of investment intent. Thus, the statute requires that "each buyer . . . represents in writing to the seller" that he is purchasing for investment.[9] It has been assumed that the drafters of this provision contemplated that "investment letters" would be used as evidence of intent, following the federal practice. *See generally, Hippensteel v. Karol,* (1973) 159 Ind.App. 146, 304 N.E.2d 796, 799; and *Galanti, Survey—1975, Securities Law Amendments,* 9 Ind.L.Rev. 59, 60 (1975). Although appellees correctly argue that the Indiana Act does not expressly require an "investment letter" as opposed to some other writing, the two "representations" involved in this case are insufficient for purposes of the Act.

In construing the Indiana exemption, we note at the outset that exemptions from the general policy of disclosure have been strictly applied under both the state and federal acts. In *Hippensteel, supra,* the Court of Appeals, Third Division, held in construing the "isolated nonissuer" exemption, that "[w]ithout an administrative regulation, only strict compliance with the statutory requirements will effect an exemption". *Id.* at 802. *And see, e. g., Quinn & Co. v. SEC,* (10th Cir. 1971) 452 F.2d 943, 946, *cert. denied,* (1972) 406 U.S. 957, 92 S.Ct. 2059, 32 L.Ed.2d 344 (construing "underwriter"), where the court reiterated that public policy "strongly supports registration"; and *SEC v. Sunbeam Gold Mines Co.,* (9th Cir. 1938) 95 F.2d 699, 701. Moreover, the burden of exemption is upon the party claiming its benefit. Ind.Code 23–2–1–16(j); *SEC v. Ralston Purina Co., supra,* and *Gilligan, Will & Co. v. SEC, supra.*

■ Defendants contend Flynn's execution of his subscription agreement for Sandy Creek stock is a representation to the

---

**6.** 17 C.F.R. § 230.146 (1975).

**7.** 15 U.S.C. § 77d (1976).

**8.** The Indiana provision was generally based on § 402(b)(9) of the Uniform Securities Act.

**9.** The 1975 amendments changed this language slightly, to require that "each purchaser of the securities gives a written representation that he is acquiring the securities for his own investment" IC 23–2–1–2(b)(10)(iii).

seller of investment intent because the Corporation's by-laws place first and second option restrictions on the resale of the stock.[10] In particular, the by-laws provide that if a shareholder offers any stock for sale and receives an offer that he finds acceptable, he must notify the corporation and allow it to purchase the stock anytime within sixty (60) days of his notification. If the corporation does not exercise its option, the stock must be offered at the same price to the other shareholders "in proportion to their shareholdings". The stock may be resold without further restriction if none of the shareholders exercises his option within sixty (60) days from the date of offer to the shareholders. The subscription agreement signed by Flynn makes no reference either to the by-laws in general, or to this specific provision. Defendants argue, however, that by-laws, when properly passed, are "sufficient notice to all stockholders". Defendants misperceive the issue. The question is not whether Sandy Creek gave notice of its by-laws to Flynn so as to make them enforceable—the issue in the cases cited by defendants [11]—but whether under a strict construction of the statute Flynn represented to the seller that he purchased for investment. The statute requires not simply that there must be written evidence of the buyer's investment, but that he "represent" his intent "to the seller". This language suggests that the buyer must anticipate that the seller will rely on his written expression, or at least that the writing must have the plain and evident tendency to induce such reliance. It is difficult to conclude that by-law resale restrictions are evidence—much less a representation—of the buyer's investment intent where they were drafted by parties other than Flynn and where there is no written indication that he was even aware of them.

In construing the statute we must consider that a corporation may conspire with

---

**10.** Article X of the By-Laws of the Sandy Creek Development Corporation provides as follows:

"*Restrictions on Transferability of Stock*
*Section 1. Sale of Shares.* In the event that any shareholder in this corporation shall desire to sell any or all of his stock, and shall have offered the same for sale and shall have received a bona fide offer for purchase by any outside party, or other shareholder, acceptable to the shareholder desiring to sell, the shareholder shall first notify the corporation in writing of his intention to so sell the stock. The notification shall give rise to an option in favor of the corporation to repurchase and redeem the stock. The option shall extend for a period of sixty (60) days from the date of the Notice of Intention to Sell. If the corporation shall exercise its option, the shareholder desiring to sell shall be obligated to have his stock redeemed by the corporation, at the same price as the bona fide offer to sell to the outside party or other shareholder, and upon terms agreeable to the selling shareholder, and to the corporation.
In the event that the option shall not be exercised by the corporation, the shareholder desiring to sell must then offer his stock to the other shareholders in this corporation, at the same price as offered to the corporation, and in proportion to their share holdings. If one or more of such shareholders decline the offer, then the remaining shareholders shall be entitled to purchase the stock in proportion to their holdings. If none of the shareholders shall exercise the option within a period of sixty (60) days from the date of offer to the shareholders, the party desiring to sell shall be free to sell his stock to any outside party or other shareholders, but no such sale shall be made for a price below that for which the stock was offered to the corporation or the shareholders.
The restriction on resale of stock shall be subject, however, to the following limitation: In the event that the stock is offered for sale to the corporation or to other shareholders as one block, then the shareholder desiring to sell shall not be obligated to sell less than the entire block, and if the corporation or the other shareholders decline to purchase the entire block, then the shareholder desiring to sell may sell the entire block, as if neither the corporation nor the shareholders had exercised or attempted to exercise their option rights hereunder, but may not sell less than the number of shares comprising the one block, without first having given the corporation and the other shareholders the right to purchase the number of shares offered for sale."

**11.** The cases cited by defendants for this proposition may also be distinguishable because the by-law provisions in these cases do not involve stock transfer restrictions. *See generally,* 2 F. O'Neal, Close Corporations § 7.16 (1958) where it is stated that reference to such by-law restrictions must be made on the share certificates, and that "[c]are must be taken that the reference is sufficient to put prospective purchasers of shares on notice. . . ." *Id.* at 56.

an "underwriter" in an attempt to market the shares without registration. Such fraud would result in injury to uninformed third party buyers. One reason for requiring an unambiguous, written *representation* of investment intent is to assist such injured third parties in an action for fraud against the "underwriter".[12] Under the relevant statute, proof of fraud requires a showing of deceit which is "intentional" or "due to gross negligence".[13] It is feasible to demonstrate such fraud where an alleged underwriter clearly states he is buying for his own investment and he then resells at the first available opportunity. But the burden may be insurmountable where his alleged representation takes the ambiguous form of a corporation buy-back provision.

Moreover, a second goal of the statute may be defeated if the construction urged by defendants is adopted. If one function of the representation requirement is to fix liability for fraud, an additional purpose may simply be to prevent the inadvertent sale of securities which should be registered. This is accomplished by insuring that both parties understand that the issuer is relying on the buyer's investment intent in order to qualify for the exemption. In the instant case, however, the subscription argument is at best simply constructive notice of the by-law provisions, and even the two documents combined do little to make the buyer aware of this reliance.

Defendants' argument regarding the Subchapter S tax election is similarly deficient. Subchapter S of the Internal Revenue Code [14] provides that the shareholders of a corporation may elect to have the income of the corporation taxed to them individually and not to the corporation. Under the code, Subchapter S status terminates and the election cannot be made again for five years if shares are sold to a new shareholder who refuses to consent to the election within sixty days.[15] The trial court

---

12. Such an action may be especially important where the corporation is no longer solvent.

13. IC 1971, 23–3–1–1(d) (Burns Code Ed.) (amended 1975). The present statute, Ind.Code 23–2–1–1(d), omits this requirement. Of course, the earlier language is relevant to construing the original private placement exemption, IC 23–2–1–2(b)(10) (amended 1975).

This language has not been construed. A recent Seventh Circuit case suggests, however, the difficult burden faced by a securities fraud plaintiff who must demonstrate gross negligence or its equivalent. The Court in *Sundstrand Corp. v. Sun Chemical Corp.*, (7th Cir. 1977) 553 F.2d 1033, was applying Rule 10b–5 under the 1934 Act, a regulation which prohibits, *inter alia*, any "device, scheme, or artifice" intended to defraud. 17 C.F.R. § 240.10b–5 (1972). It determined that

" '[R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' "

*Id.* at 1045 (quoting *Franke v. Midwestern Oklahoma Development Authority*, (W.D.Okl. 1976) 428 F.Supp. 719, 725)). The Court reasoned that under this test there would be no liability where a defendant did not disclose information because it "never came to mind,"

even though "the proverbial 'reasonable man' would never have forgotten." *Id.* at 1045 n.20.

14. 26 U.S.C. § 1371 *et seq.* (1976).

15. Subsection (e) of 26 U.S.C. § 1372 (1976) provides:

"(e) Termination
 (1) New shareholders
  (A) An election under subsection (a) made by a small business corporation shall terminate if any person who was not a shareholder in such corporation—
  (i) on the first day of the first taxable year of the corporation for which the election is effective, if such election is made on or before such first day, or
  (ii) on the day on which the election is made, if such election is made after such first day,
 becomes a shareholder in such corporation and affirmatively refuses (in such manner as the Secretary shall by regulations prescribe) to consent to such election on or before the 60th day after the day on which he acquires the stock.

   \*    \*    \*    \*    \*    \*

 (C) Any termination of an election under subparagraph (A) by reason of the affirmative refusal of any person to consent to such election shall be effective for the taxable year of the corporation in which such person becomes a shareholder in the corporation and for all succeeding taxable years of the corporation."

found that Flynn's written election, combined with the by-laws, was a representation in writing "to the seller" of his investment intent. Defendants support this finding by arguing 1) "that plaintiff executed this election with knowledge that he was participating in an election which would have substantial effect upon the Corporation currently," and 2) that because the election terminates upon sale of shares to a non-electing buyer, Flynn must have purchased for his own investment.

■■■ Although the election may be some evidence of investment intent, we hold that it, like the subscription argument, is not a representation in writing "to the seller" under a strict construction of the statute. The purchaser's intent can only be indirectly inferred from the election, and there is nothing to make a purchaser aware that the issuer is relying on his alleged representation for exemption purposes. Such a representation would be of no use to a third party purchaser in a subsequent action for fraud. Moreover, even as evidence of intent, the purported representation in writing suffers the additional defect that the election was executed on May 1, 1976, more than a year after Flynn purchased the stock. It is the buyer's intent at the time of sale which is relevant to interpreting the statute. Although subsequent documents may be evidence of the purchaser's earlier intent they obviously are of less evidentiary merit than a writing executed at the time of the sale.

The trial court's conclusions of law also rely on rhetorical paragraph one of Flynn's complaint in this cause, where it is stated that Flynn met in March, 1975, with defendants "for the purpose of discussing the investment opportunity afforded by the Sandy Creek Development Corporation". Defendants argue this language constitutes an admission that Flynn did not purchase the stock for sale to third persons. We do not believe the exemption statute contemplates that the requisite written representation could be made long after the original sale in the course of litigation between the parties; moreover, it is clear the plaintiff in this cause has not employed the phrase "investment opportunity" in the narrow sense that the statute uses the word "investment", i. e., as meaning not intended for resale.

■■■ Thus, we have determined that as a matter of law there was not written representation to support trial court's grant of summary judgment in this case. Defendants argue that IC 23–2–1–2(b)(10) should be construed to prohibit purchasers in no need of registration protection from avoiding unprofitable transactions. The Indiana provision, in contrast to the federal statute, however, emphasizes objective factors in deciding if there is a proper private placement, and we have determined that public policy requires strict compliance with these factors. Since the relevant statute does not specify what constitutes a written representation, we now interpret this language "to ascertain and effectuate the general intent of the legislature," *Economy Oil Corp. v. Indiana Department of State Revenue, supra* 321 N.E.2d at 218, and have concluded that the requirement of a representation in writing should be strictly construed in favor of registration,[16] thus requiring a buyer's clear, unambiguous statement in writing to the seller saying he is purchasing for investment and not for resale.

## ISSUE II

Our resolution of the first issue in this case determines the second issue as well. The relevant statute, IC 23–2–1–1(b)(10), clearly requires a written representation of the purchaser's investment intent. Since we have found that none of the proffered writings in this case are sufficient representations within the meaning of the statute, it follows that defendants have failed to meet

---

**16.** Although we hold that writings which are mere evidence of investment intent such as those involved in this case do not satisfy the statutory requirement, we are not here called upon to decide whether an unambiguous writing such as an "investment letter" will always constitute a proper representation that will foreclose an action by a purchaser on a claim that, despite the investment letter, the requisite investment intent did not in fact exist.

their burden of proof on exemption. *Hippensteel v. Karol, supra.* Thus, the trial court's grant of summary judgment for defendants must be reversed, and Flynn is entitled to a partial summary judgment on the issue of exemption.

 Although defendants also sought summary judgment on the theory that any offer of the securities was made by the Corporation rather than by the defendants, an examination of the pleadings, affidavits and responses to requests for admissions of the parties reveals the question as to who offered the stock to be unresolved. The trial court did not purport to decide this question.[17] We remand for only a determination of this remaining question and, if there is a judgment for plaintiff, for a determination of attorney's fees as provided for in the appropriate civil liability statute. Defendants in their pleadings raise the affirmative defense that undue delay and enjoyment of benefits by the plaintiff should bar this action. We note, however, that the defendants had the burden of establishing any affirmative defense in opposition to plaintiff's cross-motion for summary judgment. *Kline v. Kramer,* (1979) Ind.App., 386 N.E.2d 982. This issue was not addressed by any material either supporting defendants' motion for summary judgment or in opposition to Flynn's cross-motion. It follows that the issue is waived. *Kline, supra.*

Reversed and remanded.

CHIPMAN and YOUNG, JJ., concur.

---

17. Flynn argues in a cross-motion for summary judgment that the defendants would be liable even if the offer of securities was made by the corporation rather than the defendants individually, since Ind.Code 23–2–1–19(b) imposes liability on partners, officers or directors of a

seller, and each of the defendants has admitted he is a director, officer or both. Whether or not this is true, however, the trial court must still determine whether the offer was made by one or more of the defendants or by the Corporation.