H & G ORTHO, INC., and Harold Canada, and Gladys Canada, (Defendants, Counter–Claimants & Third Party Plaintiffs), and G & H Wire Company, Inc., Appellants–Defendants,

v.

NEODONTICS INTERNATIONAL, INC., d/b/a G & H Wire Company, (Plaintiff, Counterclaim Defendant & Third Party Defendant) and R. Michael Jahns, Individually, (Counterclaim Defendant & Third Party Defendant), Appellees–Plaintiffs.

No. 41A05–0401–CV–59.

Court of Appeals of Indiana.

March 9, 2005.

See also 823 N.E.2d 734.

720

Todd A. Richardson, Matthew S. Tarkington, Lewis & Kappes, Indianapolis, IN, Attorneys for Appellants.

Edward F. Schrager, Steve M. Crell, Cohen Garelick & Glazier, P.C., Arthur R. Baxter, Jr., Baxter James & Rose LLP, Indianapolis, IN, Stephen Lee Huddleston, Franklin, IN, Attorneys for Appellees.

## OPINION

BAKER, Judge.

We are confronted today with separate appeals involving the same parties and related issues that arose from the same cause of action. In this first appeal, we are called upon to decide, among other things, whether the trial court's award of damages for breach of contract and the issuance of an injunction were proper with regard to a party's alleged breach of a covenant not to compete. We also determine in the second appeal that we hand down today—*H & G Ortho, Inc. et al v. Neodontics Int'l, Inc., et al.*, 823 N.E.2d 734, No. 41A05–0406–CV–336 (Ind.Ct.App. Mar. 9, 2005) (hereinafter referred to as *H & G II* )—whether the award of attorney's fees and litigation costs that the trial court awarded to the prevailing party should be upheld.

In this case, the appellants-defendants, Harold and Gladys Canada and their companies—H & G Ortho, Inc. (Ortho), and G & H Wire Company, Inc. (G & H Wire) (collectively referred to as the Canadas)—appeal the trial court's judgment entered in favor of the appellees-plaintiffs Neodontics International, Inc., d/b/a G & H Wire Company and Michael Jahns individually (collectively referred to as Neodontics), which determined that the Canadas breached a non-competition covenant regarding the sale of their orthodontic supply business. The Canadas also urge that the amount awarded as liquidated damages and the forfeiture provisions contained in the purchase agreement (Agreement) amounted to an unenforceable penalty. The Canadas further argue that the trial court erred in denying their request for damages on a counterclaim they had filed for the alleged wrongful issuance of an injunction against them. Concluding that the trial court properly determined that the Canadas breached the non-competition clause of the Agreement, that the damage award was reasonable, and that the Canadas' request for damages on their counterclaim was properly denied, we affirm the judgment of the trial court.

## FACTS

This action is the result of a "tooth and nail" fight over the sale of a business that marketed orthodontic products, and the operation of a non-competition covenant incident to that transaction. For a number of years, Harold owned and operated a tool and die shop in Greenwood, where he acquired a great deal of expertise in the orthodontic products market. Sometime in 1975, Harold developed a manufacturing process that greatly improved the quality of wire arches used in the practice of orthodontia. Sometime thereafter, the Canadas established G & H Wire and began to manufacture and sell wire arches. The various products sold by distributors include a full array of items used by orthodontists in the process of straightening teeth. The products include an orthodontic bracket, which is placed directly on the teeth. The orthodontist places wire through the bracket, and he then adjusts it as part of the teeth straightening process. By 1988, the Canadas' business expanded to include additional products for use in the practice of orthodontia including rubber bands, hand tools and orthodontic brackets. The Canadas' products were sold both nationally and internationally.

In 1994, Jahns began working for G & H Wire, and he eventually became interested in acquiring the company. Negotiations

ensued, and Jahns and the Canadas ultimately entered into the Agreement for the sale of the company's assets. The Agreement was executed on March 24, 1995, which provided for a purchase price of $569,385. Neodontics was required to tender a down payment of $100,000, and a promissory note was to be executed for the remaining balance. It was agreed that Neodontics—the company in which Jahns was a director, officer and shareholder—would make installment payments toward the purchase price of the assets over a six-year period. The Agreement also contained a covenant not to compete that included a lifetime and worldwide non-compete provision that bound G & H Wire, but not the Canadas individually. The Canadas retained the company name of G & H Wire for a time after the sale, but they later changed the name of the business to Ortho in order to avoid confusion with Neodontics, which continued using the name, G & H Wire.

At some point, it was determined that the parties actually agreed that the purchase price of the business was closer to $1.4 million. To be sure, the Canadas and Jahns acknowledged that a portion of the consideration for the sale was to be handled apart from the written terms of the Agreement. Indeed, Jahns executed a promissory note in January 1995, for the sum of $700,000 including interest to the Canadas, which was neither referenced nor incorporated into the original Agreement. The parties likewise had an informal understanding that the payments on the separate promissory note were to be made in cash.

Trouble started to brew over the method of payment under the Agreement, so an addendum was executed that effectively modified the original terms. Among other things, the addendum provided that Neodontics was to pay the sum of $602,603.05 for a revised non-compete clause that was limited to a period of seven years. The addendum also stated that the Canadas were allowed to compete against Neodontics only with respect to the orthodontic products that were specified in the addendum. In particular, the Canadas were permitted to manufacture, promote and sell a certain type of bracket. Also, Neodontics was required to pay a consulting fee to Harold in the amount of $150,000 in exchange for Harold's expertise. The addendum also stated that the payments were to cease if the Canadas breached the Agreement.

In the event of a breach, the addendum to the Agreement provided that Neodontics could recover under one of the following liquidated damages clauses: "(1) the sum of 100% of the gross revenues that had been generated from the research and development, manufacture ... and sale of any product in violation of the covenants; or (2) a payment of $5000 for each incident of violation of the covenants contained in [the] Agreement." Appellant's App. p. 153.

On November 25, 1996, pursuant to a request from the Canadas, Jahns gave his written consent authorizing the Canadas to sell certain mold sets to Ortho Technology, another orthodontic manufacturing company. However, it was later determined that from February 1997 through August 1998, the Canadas sold 120,630 standard edgewise brackets without Neodontics's consent or knowledge, for an amount of $67,255.10. The Canadas did not disclose to Jahns that they had sold orthodontic mold sets to Ortho Technology in August, 1996.

In 1998, the Canadas desired to sell their interest in other products to Ortho Technology. These items included mold sets for an item identified as the Mirage/Medallion Roth prescription bracket

and standard edgewise bracket. Ortho Technology wrote to Jahns requesting consent for their anticipated acquisition of the products that the Canadas produced. Jahns eventually gave his consent for Ortho Technology to acquire the Canadas' bracket molds and inventory, after several conditions had been satisfied. Ortho Technology consummated the purchase with the execution of an asset purchase agreement on August 31, 1998.

Thereafter, on April 26, 1999, Jahns wrote to the Canadas and admonished them that they had relinquished their remaining orthodontic products to Ortho Technology and were, therefore, precluded from further involvement in the orthodontic industry in accordance with the addendum to the Agreement that the parties had executed. By this time, however, the Canadas had already sold some brackets, and had received revenue of $630 for the sale of some orthodontic welders—yet another product that they had purportedly been prohibited from selling under the addendum.

On August 29, 2001, Jahns obtained a copy of an email that had been written by Harold and sent to various individuals in the orthodontic industry in the Philippines. This letter stated as follows:

Dear Doctor,

In January of 2002 we will offer our new orthodontic bracket 'focus' to doctors. & nbsp; You will receive our brochure on our new baraker [sic] that we will offer for only $1.00 (U.S.) each.

We are looking for orthodontic distributors in your country. & nbsp; We would appreciate it if you could supply us with the names, addresses, e-mail address and fax numbers of orthodontic distributors in your country. & nbsp; We are also looking for dental distributors that offer orthodontic products.

Your help in this mater would be greatly appreciated.

Regards,

Harold Canada

H & amp; G Ortho, Inc. (U.S.A)

Appellant's App. p. 432. Upon examining this email, Jahns considered the Canadas' offer to sell this particular product as a violation of the addendum to the Agreement. Moreover, Jahns viewed the introduction of this new bracket to be a material breach of the non-compete clause. Hence, Neodontics refused to make the September 1, 2001 final installment payment of $100,000 that was due under the non-compete provision.

On September 11, 2001, Neodontics filed a complaint against G & H Wire and the Canadas—both individually and through their corporation, H & G Ortho—alleging that they had violated the covenant not to compete for: (a) soliciting dentists and orthodontists with the sale of the "focus" bracket that was described in the email; (b) soliciting others in the industry for assistance in the manufacture and sale of orthodontic and dental wire and other materials; and (c) soliciting suppliers of various orthodontics materials. In addition to the claim for damages, Jahns sought—and eventually obtained—a temporary restraining order that (a) required that the Canadas abide by the terms and conditions of the addendum; and (b) prohibited the Canadas from destroying any evidence, including, but not limited to, computer information, pending further order of the court. Finally, Neodontics sought recovery of its attorney's fees, expenses and costs pursuant to the addendum. This action was originally filed in the Hamilton Superior Court.

The trial court issued a temporary restraining order on September 11, 2001, thereby enjoining the Canadas from engaging in conduct that allegedly violated

the non-competition covenant. The trial court also set a preliminary injunction hearing on September 19, 2001. While the Canadas acknowledged that they had actual knowledge of the hearing, they failed to appear and did not produce any documents that had been required by the subpoenas.

The parties ultimately reached an agreement with respect to this litigation that was approved by the trial court on November 7, 2001. This order prohibited the Canadas' involvement in the orthodontic industry until the litigation was resolved. The agreed entry also provided for transfer of the cause to Johnson County.

On November 29, 2001, the Canadas filed their answer to the complaint along with a counterclaim that was based on Neodontics's failure to make the final installment payment of $100,000 under the addendum. The Canadas also named Jahns as a counterclaim defendant as the guarantor of Neodontics's payment obligation, and they asserted a claim alleging that the temporary restraining order of September 11, 2001, was wrongfully issued.

Thereafter, both parties filed motions for summary judgment, and the trial court granted Neodontics's motion in part, finding—as a matter of law—that the Canadas' sale of the standard edgewise brackets and promoting the sale of the Focus bracket both fell within the scope of the non-competition covenants. Prior to trial, the trial court concluded that the Canadas had waived any argument that the non-competition covenant was unenforceable, inasmuch as they had failed to present that issue at the summary judgment stage.

The case proceeded to trial, and following a three-day trial by the court that concluded on June 12, 2003, it was determined that the Canadas were in breach of the non-competition covenant with respect to the sale of the edgewise bracket and the promotion of the Focus bracket, and that Neodontics did not waive its claim that the Canadas had breached the contract. The trial court also ruled that the Canadas' breach of the Agreement relieved Neodontics of its obligation to make the final $100,000 installment payment. And the trial court further rejected the Canadas' counterclaim as to their allegation that the temporary restraining order had been wrongfully issued.

In the end, Neodontics was awarded $67,885.10, pursuant to the liquidated damages provision based on the gross revenues that the Canadas had derived from the competing sales. Neodontics was also awarded $400,000 as reimbursement of prior payments on the sale of the business subsequent to the date of the first alleged breach of the Agreement. The trial court also awarded pre-judgment interest to Neodontics on the reimbursement portion of the award.

The trial court then scheduled an evidentiary hearing to determine whether Neodontics was entitled to attorney's fees and litigation costs. Following the hearing, the trial court ordered the Canadas to pay $572,689.73 to Neodontics in attorney's fees and litigation expenses. Neodontics had originally petitioned the trial court seeking payment of $762,272.53. The Canadas are now appealing both the initial damage award as well as the award of attorney's fees and litigation expenses. We address the issues relating to the breach of the Agreement and the validity of the damage award in this appeal, whereas we resolve the questions presented with respect to the attorney fee and litigation cost award in *H & G II*.

## DISCUSSION AND DECISION

### I. The Canadas' Claim With Respect To Summary Judgment

The Canadas first contend that the trial court erroneously granted partial sum-

mary judgment in Neodontics's favor with respect to their sale of certain orthodontic equipment. In particular, the Canadas maintain that the trial court erred in finding—as a matter of law—that the Canadas' sale of standard edgewise brackets and promotion of the Focus brackets fell outside the scope of the exception to the non-competition clause in the Agreement. Hence, the Canadas urge that construing the exception to the non-competition covenant in the Agreement to cover only one type of bracket impermissibly expanded the scope of the activities that were restricted.

In resolving this issue, we first note that when reviewing the grant or denial of a summary judgment motion, we apply the same legal standard as the trial court. *Mattingly v. Warrick County Drainage Bd.*, 743 N.E.2d 1245, 1247 (Ind.Ct.App. 2001). As we stated in *Little Beverage Co. v. DePrez*, 777 N.E.2d 74, 77–78 (Ind.Ct. App.2002), *trans. denied:*

> [S]ummary judgment is appropriate when no designated genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Our standard of review is not altered by cross motions for summary judgment on the same issues. A party appealing the denial of summary judgment carries the burden of persuading this court that the trial court's decision was erroneous. The movant must demonstrate the absence of any genuine issue of fact as to a determinative issue and only then is the non-movant required to come forward with contrary evidence. This court may not search the entire record but may only consider the evidence that has been specifically designated. All pleadings, affidavits, and testimony are construed liberally

and in a light most favorable to the nonmoving party.

(citations omitted).

We also note that when a court is called upon to interpret an unambiguous contract, it must give effect to the intention of the parties "as expressed in the four corners of the document." *Art Country Squire LLC v. Inland Mortgage Corp.*, 745 N.E.2d 885, 889 (Ind.Ct.App.2001). The unambiguous language of the contract is conclusive upon the parties to the contract and upon the courts. *McLinden v. Coco*, 765 N.E.2d 606, 611–12 (Ind.Ct.App. 2002). Also, a contract is not ambiguous merely because one party seeks to apply its own interpretation to its meaning. *Meridian Mut. Ins. Co. v. Purkey*, 769 N.E.2d 1179, 1183 (Ind.Ct.App.2002).

In support of their argument that the trial court erred in determining as a matter of law that the sale and promotion of the brackets fell outside the scope of the exception to the non-competition clause, the Canadas direct us to the following language in the addendum: "[The Canadas] are permitted to be involved in the manufacture, promotion, distribution and sale of . . . orthodontic stainless steel one piece brackets." Appellant's App. p. 409. Hence, when examining this provision in isolation, the Canadas urge that the standard edgewise brackets that they sold were the type of orthodontic materials described above. On the other hand, Neodontics quotes additional language from the addendum: "G & H and the [Canadas] shall not participate in the promotion, sale or distribution of any bracket *except those which they manufacture as depicted on Exhibit C4.*" Appellant's App. p. 409 (emphasis added). As Neodontics asserts, it is not disputed that standard edgewise brackets are not Mirage Roth prescription brackets, while Exhibit C4 to the addendum depicts only that particular bracket.

To be sure, the above exhibit was created and made a part of the addendum by the Canadas. Appellee's App. p. 331–32. The exhibit depicts a "Mirage Roth" prescription bracket, and page one of the exhibit includes a narrative description of "our new Mirage." Appellant's App. p. 420–21. The second page identifies only the Mirage Roth prescription bracket, and it goes on to describe its technical specifications. Appellant's App. p. 421.

As the designated evidence indicates, David Brosius—the president of ODP, the company which manufactures the Mirage mold sets—acknowledged that the term "orthodontic stainless steel one-piece bracket" is not a term of art utilized in the orthodontic industry. Appellee's App. p. 576. Brosius testified that the standard edgewise bracket does not have the characteristics or configurations of the bracket that is depicted in Exhibit C4. Appellee's App. p. 576–78. In considering that evidence, it is apparent that had the parties intended for the Canadas to be involved in the promotion and sale of any "orthodontic stainless steel one-piece bracket" without limitation, there would be no need to have depicted the sole bracket that the Canadas could manufacture and sell that was set forth and described in the exhibit.

Neodontics also designated other evidence setting forth the differences between the two brackets. In particular, Dr. Howard Fine, a graduate of the Harvard School of Dentistry and Professor of Orthodontics at Einstein University, testified that the brackets are made from different mold sets, and similar features of the various brackets do not mean that they are identical. To be sure, Dr. Fine observed that Exhibit C4 does not depict a Focus bracket. Appellee's App. p. 184–88; 194. And the design and contouring of the brackets are noticeably different when they are visually inspected. Appellee's App. p. 184–88; 200–03. This evidence was not contradicted by the Canadas. In light of the designated evidence presented to the trial court that the Canadas did not dispute, we conclude that the trial court properly granted summary judgment to Neodontics on this issue. Hence, there was no error in determining that both the standard edgewise and focus brackets were prohibited from sale and promotion by the Canadas in accordance with the addendum to the Agreement.

## II. Neodontics's Purported Consent to the Sale Of Edgewise Brackets

■ In a related issue, the Canadas claim that Neodontics consented—and therefore waived—any objection to their sale of the 120,630 standard edgewise brackets. Inasmuch as Jahns countersigned a letter in August 1998 approving the Canadas' sale of molds and inventory, and expressly acknowledged that he had no "right, title or interest in or with respect to, any of the molds or inventory," appellant's app. p. 19, the Canadas assert that Neodontics has waived any objection to the sale. Put another way, the Canadas are contending that Neodontics—the party seeking to enforce the non-competition covenant—expressly disclaimed any interest in the edgewise brackets that the Canadas had sold.

■ In addressing this issue, we note that the construction and legal effect of a written disclaimer presents a question of law for this court. See *Noblesville Redevelopment Comm'n v. Noblesville Assoc. L.P.*, 674 N.E.2d 558, 562 (Ind.1996) (observing that well-settled Indiana law holds that a trial court determines the force and effect of a written instrument). Waiver of a contractual right requires an intentional relinquishment of a known right. *N. Ind. Commuter Transp. Dist. v. Chicago South-Shore and South Bend R.R.*, 685 N.E.2d 680, 695 (Ind.1997). Here, because waiver

was presented as an affirmative defense, the burden of proving waiver was on the Canadas. *See GKC Indiana Theatres, Inc. v. Elk Retail Investors, LLC*, 764 N.E.2d 647, 653 (Ind.Ct.App.2002).

The Canadas urge that the trial court's decision must be reversed on this issue because the plain meaning of Jahns's disclaimer was not given effect and, therefore, the Canadas' planned introduction of the Focus bracket was neither a breach nor a threat of breach of the Agreement. Appellant's Br. p. 20. The record reflects that the Canadas made two different standard edgewise bracket sales. The first involved the sale of 120,630 brackets to numerous distributors from a period beginning on February 13, 1997, until August, 1998. Appellee's App. p. 375, 400. Also, 19,110 standard edgewise brackets were sold as inventory to Ortho Technology on August 31, 1998. Appellee's App. p. 419, 433. The trial court's award of liquidated damages for the Canadas' sale of standard edgewise brackets was limited to the 120,630 brackets that generated revenue in the amount of $67,255.10. Appellant's App. p. 86.

The correspondence that was exchanged between Jahns and Ortho Technology establishes that the only rights and claims that Neodontics relinquished were those that applied to the standard bracket mold sets and inventory that was sold to Ortho Technology. Moreover, there is no evidence demonstrating that Neodontics had any knowledge of the prior sale of the 120,630 brackets until long after the letter had been written. In fact, Neodontics had no knowledge of the Canadas' sale of 120,-630 brackets until after this litigation had commenced. Appellee's App. p. 270–74. To be sure, the evidence presented at trial supports the trial court's conclusion that the consent form that Jahns signed permitting the Canadas to be involved with standard edgewise brackets was merged into the third addendum that limited the Canadas' involvement only to a particular type of bracket—the Mirage/Medallion Roth prescription bracket that was depicted in the exhibit. Hence, it was reasonable for the trial court to conclude that the evidence did not demonstrate that Neodontics intentionally relinquished its rights under the third addendum with respect to the sale of the standard edgewise brackets that occurred between February 13, 1997 through August, 1998. Appellant's App. p. 65. As a result, the Canadas' claims attacking these findings must fail.

### III. The Canadas' Breach

In a separate argument, the Canadas argue that the trial court's determination that they had breached the Agreement was not supported by the evidence. In particular, the Canadas maintain that the trial court erred in determining that the Focus bracket they produced and promoted amounted to a breach of the addendum.

■ In reviewing the contentions advanced by the Canadas, we note that Indiana Trial Rule 52(A) provides that "[o]n appeal of claims tried by the court without a jury ... the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." This court engages in a two-tiered standard of review when applying this standard. *Wagner v. Estate of Fox*, 717 N.E.2d 195, 200 (Ind.Ct.App. 1999). First, we consider whether the evidence supports the findings, construing the findings liberally in support of the judgment. *Id.* And we then determine whether the findings support the judgment. *Id.*

■ Findings are clearly erroneous only when a review of the record leaves us firmly convinced that a mistake has been

made. *Id.* A judgment is clearly erroneous when the findings of fact and conclusions thereon do not support it. *Id.* In applying this standard, we neither reweigh the evidence nor judge the credibility of the witnesses. Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.*

■ In this case, the record shows that the Canadas sent an email on August 23, 2001 to approximately fifty addresses, advising individuals and their companies of the new Focus bracket that would become available in January, 2002. Appellee's App. p. 532–33. This note contained the Canadas' marketing strategy that could pull customers to another supplier. Appellee's App. p. 557–59. Recipients were solicited to either provide names of other distributors or otherwise forward the email to other potential customers who might be interested in the product. Appellee's App. p. 266. Additionally, when this email was sent, the evidence showed that Dr. Fine paid $3.50 for a comparable orthodontic product. Appellee's App. p. 558. The lowest price for which Neodontics was selling Roth prescription brackets at that time was $1.45. Appellee's App. p. 273. On the other hand, the Canadas' email suggested that the Focus bracket could be purchased for only $1.00. Dr. Fine went on to testify that practitioners might very well change bracket suppliers based upon that price—particularly if the supplier was one of Harold's highly-regarded reputation. Appellee's App. p. 557–58.

Notwithstanding this evidence, the Canadas point to *Potts v. Rev. Bd.*, 475 N.E.2d 708 (Ind.Ct.App.1985), *trans. denied*, in support of their argument that the email was merely an indication that they were "preparing" to re-enter the market. Appellant's Br. p. 22. In *Potts*, we determined that an employee can make preliminary arrangements to compete, such as investing or making plans to purchase a rival corporation, except that he cannot properly use confidential information that is peculiar to his employer's business before he leaves that employment. *Id.* at 712. Under this rationale, the Canadas argue that because there was no evidence that their "preliminary plans,"—the email notice—resulted in any type of injury, and that the addendum to the Agreement permitted them to engage in various research and development activities, the judgment determining that they had breached the contract cannot stand.

We reject that notion, inasmuch as the evidence showed that the tactics in which the Canadas engaged involved much more than investments of capital, the acquisition of equipment, or other actions that could be construed as merely internal preparation. *Potts* simply does not stand for the proposition that an individual who is under a covenant not to compete may simply re-enter the market in a manner that competes with the covenantee before the covenant expires. In our view, the trial court certainly had before it enough evidence to conclude that the Canadas were beyond the boundaries set forth in *Potts,* and their activities constituted a genuine threat to Neodontics. As a result, we find no error when the trial court determined that the Canadas' actions amounted to a breach of the addendum.

### IV. Validity of Restrictive Covenant and Enforceability Thereof

■ The Canadas also contend that notwithstanding our decision as to their production, promotion and sale of the brackets, the worldwide scope and eight and one-half year term of the non-compete clause in the addendum render the non-compete clause unenforceable. In particular, the Canadas urge that the trial court

improperly determined that they waived the issue regarding the enforceability of the covenant, and they argue that the covenant is so overly broad that the technique of "blue-penciling" [1] cannot render the covenant reasonable. Appellant's Br. p. 29–30.

 The Canadas correctly point out that non-competition covenants are disfavored by law as a restraint on competition and a restriction on employment. *Kladis v. Nick's Patio, Inc.,* 735 N.E.2d 1216, 1220 (Ind.Ct.App.2000). Such covenants will be enforced only if they are reasonable with respect to the covenantee, the covenantor and the public interest. *Id.* However, non-competition agreements ancillary to the sale of a business are not as "ill-favored at law" as employee covenants. *Id.* The different treatment results, in part, from the disparate bargaining power enjoyed by one selling a business as compared to an employee who has only labor and skill to offer. *Id.* With respect to the sale of a business, there is likely equal bargaining power between the parties, and the proceeds of the sale generally enable the seller to support himself temporarily without the immediate practical need to enter into competition with his former business. *Dicen v. New Sesco, Inc.,* 806 N.E.2d 833, 842 (Ind.Ct.App.2004). Additionally, sellers of a business are customarily paid a premium for their agreement not to compete. *Id.* Finally, the question of whether a non-competition covenant is unreasonable and unenforceable is a matter of law for this court to decide independently. *Ackerman v. Kimball Int'l, Inc.,* 652 N.E.2d 507, 510 (Ind.1995).

 Regardless of these above-stated principles, we note that a party may not present an argument or issue to this court on appeal unless that issue was first presented to the trial court. *Sedona Dev. Group, Inc. v. Merrillville Road,* 801 N.E.2d 1274, 1280 (Ind.Ct.App.2004). Here, Neodontics filed its motion for partial summary judgment on April 2, 2002, claiming that the Canadas breached the non-compete provisions of the addendum. Appellant's App. p. 327–29. The Canadas responded by designating evidence to support their contentions that: a) the Focus bracket is identical to the Medallion bracket, f/k/a Mirage; (b) Neodontics consented to the sale of standard edgewise brackets; and (c) the August 23, 2001 email did not amount to a breach of the contract. Appellant's App. p. 230–326; 330–56. At no time did the Canadas designate evidence or make an argument in any of their summary judgment filings that the non-compete provisions of the addendum were unenforceable. Inasmuch as the Canadas did not raise the enforceability and reasonableness of the non-competition clause at the trial stage, the issue is waived. *See id.*

In an effort to avoid waiver, the Canadas maintain that because Neodontics's claim for breach of the Agreement was only partially decided on summary judgment—issues of fact pertaining to waiver

---

1. If portions of a covenant are found to be unreasonable, the court "may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement they have not made." *Smart Corp. v. Grider,* 650 N.E.2d 80, 83 (Ind. Ct.App.1995). On the other hand, if a covenant is clearly divisible into parts, and some parts are reasonable while others are unreasonable, a court may enforce the reasonable portions only. *Hahn v. Drees, Perugini & Co.,* 581 N.E.2d 457, 462 (Ind.Ct.App.1991). Pursuant to this "blue-penciling," process, a court strikes unreasonable provisions from the covenant. When applying the blue pencil, a court must not add terms that were not originally part of the agreement. *Smart Corp.,* 650 N.E.2d at 83–84. Rather, "unreasonable restraints are rendered reasonable by scratching out any offensive clauses to give effect to the parties intentions." *Id.* at 84.

as to the standard edgewise brackets and the breach relating to the Focus bracket— their defense of unenforceability is preserved. Appellant's Br. p. 24–25. However, the Canadas cite no authority for this proposition, and our prior decisions point to the contrary. It has been held that once the moving party designates evidence relevant to an affirmative defense, the burden shifts to the defendant to come forward with competent evidence to support the affirmative defense. *See Paint Shuttle, Inc. v. Continental Cas. Co.*, 733 N.E.2d 513, 519 (Ind.Ct.App.2000), *trans. denied.*

In *Flynn v. Klineman*, 403 N.E.2d 1117, 1118 (Ind.Ct.App.1980), this court determined that the failure to designate evidence to support an available affirmative defense waives that defense on remand, even where portions of the claim survive summary judgment. In that case, the plaintiff sued three promoters of a corporation upon an allegation of securities fraud. The plaintiff alleged that the three individuals sold unregistered securities to the plaintiff. *Id.* The defendants, in their answer, asserted two affirmative defenses: undue delay and enjoyment of benefits. *Id.* at 1126. The defendants also sought summary judgment, claiming that the offer relating to the securities had been made by the corporation, and not by them individually. The trial court's summary judgment order did not resolve the issue of who offered the securities. In the end, however, we held for the plaintiff on the issue of registration, but remanded the case to the trial court on the issue as to who actually offered the securities for sale. *Id.* At the same time, we rejected the defendants' argument that they should be permitted to pursue their affirmative defenses in subsequent proceedings:

In their pleadings [the defendants] raise the affirmative defense that undue delay and enjoyment of benefits by the plaintiff should bar this action. We note, however, that the defendants had the burden of establishing any affirmative defense in opposition to plaintiff's cross-motion for summary judgment. [Citation omitted]. This issue was not addressed by any material either supporting defendants' motion for summary judgment or in opposition to [plaintiff]'s cross-motion. It follows that the issue is waived.

*Id.* at 1126.

Following the lead of *Flynn*, we note in this case that the evidence established that Neodontics filed a motion for summary judgment on the issue of a violation of the covenant not to compete. In response, the Canadas made no argument and designated no facts to support their affirmative defense of unenforeceability. To be sure, the *only* evidence offered in their summary judgment submission pertained to the issue of waiver and consent. Again, inasmuch as the Canadas failed to designate evidence on the issue of enforceability, the trial court correctly determined that the issue is waived.[2]

### V. Damages

#### A. Liquidated Damages and the "Reimbursement"

The Canadas next argue that even if the judgment for Neodontics may stand, the damage award was grossly excessive. Specifically, the Canadas urge that the liquidated damages and forfeiture provisions contained in the Agreement constituted an unenforceable penalty because: (a) the award of gross receipts was not a reasonable estimate of Neodontics's lost profits; and (b) Neodontics received a sub-

---

**2.** Because we have determined that the Canadas have waived this issue, we need not address their contention that "blue-penciling" could not render the covenant reasonable or enforceable.

stantial refund of the purchase price, retained the business, recovered liquidated damages and secured injunctive relief.

Where a clause in a contract allows for the payment of liquidated damages, such a provision is enforceable only to the extent that the damages represent reasonable compensation for the injury inflicted. *Olcott Int'l & Co. v. Micro Data Base Sys., Inc.,* 793 N.E.2d 1063, 1077 (Ind.Ct.App.2003), *trans. denied.* To be sure, the stipulated sum of liquidated damages must fairly be allowed as compensation for the breach. *Id.* The determination of whether a contract provision constitutes liquidated damages or an unenforceable penalty is a question of law to be determined by the court. *Gershin v. Demming,* 685 N.E.2d 1125, 1128 (Ind.Ct.App.1997). Relevant facts such as the intention of the parties, the reasonableness of the stipulation and the circumstances of the case shall be considered. *Id.* We also note that a liquidated damage provision is particularly well-suited to a covenant not to compete ancillary to the sale of a business. *Raymundo v. Hammond Clinic Assoc.,* 449 N.E.2d 276, (Ind.1983). In *Raymundo,* our supreme court stated that

> Contracts not to engage in a particular business or profession belong to that class of cases which is expressly adapted to stipulation for liquidated damages, because it is practically impossible to fix the exact amount of damages resulting from a breach of the agreement.

*Id.* at 283–84 (quoting *Beiser v. Kerr,* 107 Ind.App. 1, 11, 20 N.E.2d 666, 669–70 (1939)).

Here, the difficulty in proving the precise amount of damages was illustrated by the testimony at trial. Specifically, an expert for Neodontics testified that the company sustained losses in the amount of $471, 879 as a result of the Canadas' breach, appellee's app. p. 291, 353–56, whereas the Canadas' expert determined that damages could not have amounted to any more than $9,925. Appellee's App. p. 441–46. The Canadas also acknowledged that cash sales were made where no records were kept, and that invoices had been lost. Appellee's App. p. 292–94, 566–67. In light of these circumstances, it is apparent to us that the actual damages sustained were, indeed, difficult to assess. To be sure, notwithstanding the evidence that Neodontics had damages of $471,879, the trial court applied the "gross revenue" option set forth in the Agreement and awarded less than fifteen percent of Neodontics's claimed damages. Hence, we cannot say that the liquidated damages clause in the Agreement constituted an unenforceable penalty.

The Canadas, however, go on to complain that the trial court's award of $67,885.10 and reimbursement to Neodontics of $400,000 constitutes a wrongful compound damage award that resulted in a penalty. In support of their argument, the Canadas direct us to *Patton v. Mid–Continent Sys., Inc.,* 841 F.2d 742 (7th Cir. 1988), a case that involved a double award of damages for the same breach. However, in this case, the only damages that were awarded were for $67,885.10. The $400,000 amount awarded represented the reimbursement to Neodontics for the payments that it made after the breach had occurred, and after the damages had been sustained. In essence, this amount was awarded as a result of the Canadas' breached promise not to compete in the marketplace.

It is also noteworthy the addendum to the Agreement represented the fourth time that the parties had negotiated and refined the terms of their bargain. Both Neodontics and the Canadas were represented by accountants and legal counsel. Appellee's App. p. 248–50. There is simply no evidence demonstrating that the addendum and the Agreement represented

anything other than the parties' freely bargained agreement. As a result, we conclude that the trial court's award of damages to Neodontics was proper.

### B. Counterclaim—Damages For Wrongful Injunction

In addition to challenging the damage award, the Canadas argue that they are entitled to recover upon their counterclaim for the issuance of a wrongful injunction. In support of their claim, the Canadas state that "[d]espite the absence of any serious competitive threat or any realistic risk of immediate injury, Mr. Jahns and Neodontics launched major litigation against the Canadas and succeeded in enforcing the grossly overreaching provisions of the non-competition covenant and in securing a ruinous damage award." Appellant's Br. p. 38.

■■■ In considering this issue, we note that the test for reviewing whether an injunction was wrongly issued is not whether the injunction was ultimately dissolved, but whether injunctive relief was warranted under the facts of the case. *Nat'l Sanitary Supply Co. v. Wright*, 644 N.E.2d 903, 905 (Ind.Ct.App.1994). Also, where a temporary injunction is dissolved, and it is not replaced by a permanent injunction, the enjoined party is generally entitled to compensation for the damages he incurred. *Hampton v. Morgan*, 654 N.E.2d 8, 9 (Ind.Ct.App.1995). We note that in order to recover damages because of an injunction, it must be shown that any damage sustained is the natural, actual and proximate result of such injunction. *Id.* The rule is stated in High on Injunctions (4th Ed.) § 1663, as follows:

> The liability on an injunction bond is limited to such damages as arise from the suspension or invasion of vested legal rights by the injunction. Speculative and remote damages are not properly allowable nor are those which are merely consequential, the limit being such

damages as flow directly from the injunction as its immediate consequence. *See also United States Fidelity & Guaranty Co. v. State ex rel. Ogden*, 104 Ind.App. 21, 5 N.E.2d 115, 117 (1936).

In this case, we note that the Canadas' asserted defense to the injunction is contrary to the evidence and to the findings made by the trial court. In particular, the trial court rejected the Canadas' arguments that they had not violated the addendum, and it then determined that the Canadas were precluded from involvement with the Focus and standard edgewise brackets. As discussed above, we are upholding that judgment.

■■■ The temporary restraining order (TRO) merely requested that the Canadas refrain from violating the addendum and not to obstruct justice. It did not prohibit the Canadas from engaging in any lawful conduct. Rather, the TRO preserved the status quo by requiring compliance with the addendum and prohibiting the destruction of evidence. Further, no involuntary preliminary or permanent injunction was entered following the issuance of the temporary restraining order. And the Agreed Entry and Order Pendente Lite that the parties executed imposed even greater restrictions than the TRO or the express provisions of the addendum. Hence, the Canadas cannot successfully complain that they sustained damages that arose from prohibitions that were contained in the negotiated and voluntarily executed agreed entry. And it follows, therefore, that they similarly were not entitled to recover damages as a result of the TRO that had been issued. For these reasons, we affirm the trial court's decision to deny the Canadas any relief on their counterclaim regarding the issuance of the injunction.

### CONCLUSION

In light of the issues discussed above, we conclude that the trial court properly

granted Neodontics's motion for summary judgment regarding the Canadas' sale of the standard edgewise brackets and the promotion of the Focus prescription brackets, in that neither of these products were depicted in the third addendum to the Agreement. We also observe that the evidence presented at trial supports the trial court's determination that the Canadas breached the Agreeement, and that the Canadas' had waived any challenge to the enforceability of the Agreement. Finally, we conclude that the damage award was proper, and that the trial court properly denied the Canadas relief on their counterclaim regarding the issuance of the injunction.

The judgment of the trial court is affirmed.

SHARPNACK, J., and FRIEDLANDER, J., concur.